**Bakari LeFLORE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–0407–CR–358.**

Court of Appeals of Indiana.

March 15, 2005.

---

Katherine A. Cornelius, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Stephen Tesmer, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Bakari LeFlore was found guilty by a jury of murder, attempted robbery, a Class B felony, and carrying a handgun without a license, a Class A misdemeanor. The trial court merged the attempted robbery conviction into the murder conviction and sentenced LeFlore to fifty years in the Indiana Department of Correction. LeFlore now appeals his convictions. We affirm.

### Issues

LeFlore raises four issues for our review, which we restate as the following:

1. Whether the trial court properly removed a juror from service during jury deliberations;

2. Whether the trial court properly admitted into evidence copies of recorded phone conversations LeFlore made while incarcerated;

3. Whether the trial court properly allowed the State to use transcripts of the recorded phone conversations to impeach LeFlore's brother, Shabaka's, credibility; and

4. Whether the State presented sufficient evidence to establish the *corpus delicti* of LeFlore's crimes.

### Facts and Procedural History

On March 31, 2003, Aaron Hart and Colter Norris drove to the Speedway gas station on the corner of Washington Street and Emerson Avenue in Indianapolis. When Hart got out of the car at the gas station, Terry Farries approached him and asked where the "weed" was. Farries then asked Hart if he would like to buy some marijuana. Hart said that he did but needed to get some money to make the purchase. Hart then asked Farries to follow him so he could get money. Farries got into LeFlore's car, and when Hart left the gas station in his car, LeFlore and Farries followed him. Hart dropped Norris off at a friend's house, and then continued on to his mother's house to get money.

Hart parked in a church parking lot directly across the street from his mother's house. When Hart got out of his car, LeFlore and Farries approached him, brandishing guns. LeFlore and Farries

told Hart to put his hands on the car, and Hart complied. LeFlore and Farries then demanded that Hart empty his pockets. After Hart complied, LeFlore and Farries demanded that Hart give them the necklace that he was wearing. At that point, LeFlore pointed his gun at Hart's head and stated that they ought to "do this white boy in." Tr. at 103.

During this time, Hart's mother began walking over to the church parking lot, when she noticed that Hart was there with two other men. She observed one of the men pulling on Hart's necklace and pointing a gun at his head. She then yelled at the men to find out what was going on. At that point, Hart pushed the gun away from his head, causing it to discharge. Hart then ran to his mother's house. When he arrived, he looked back and saw LeFlore driving away. Hart's mother also ran back to her house and called the police.

When police responded, they found Farries dead in the church parking lot from a gunshot wound through his left eye. Ultimately, the State charged LeFlore with felony murder, attempted murder as a Class A felony, attempted robbery as a Class B felony, and carrying a handgun without a license, a Class A misdemeanor. After a jury trial, LeFlore was convicted of felony murder, attempted robbery, and carrying a handgun without a license. LeFlore waived his right to a jury trial for a Class C felony enhancement on the handgun conviction due to a prior felony conviction. The trial court merged the attempted robbery conviction into the murder conviction and sentenced LeFlore to fifty years for the felony murder conviction and four years for the enhanced carrying a handgun without a license conviction, sentences to run concurrently. LeFlore now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

On appeal, LeFlore contends the trial court erred by (1) removing a juror from service during deliberations; (2) admitting into evidence copies of recorded phone conversations that LeFlore made to his brother, Shabaka, while LeFlore was in jail awaiting trial; and (3) allowing the State to use transcripts of the recorded phone conversations to impeach Shabaka's credibility. Finally, LeFlore contends that the State failed to present evidence independent of his confession to satisfy the *corpus delicti* requirement. We will address each contention in turn.

### I. Removal of Juror During Deliberations

LeFlore first contends that the trial court erred when it removed a juror during deliberations and substituted an alternate for the removed juror. We disagree.

#### A. Standard of Review

Indiana Trial Rule 47(B) states, in pertinent part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." In general, trial courts have broad discretion in determining whether to replace a juror with an alternate. *Slate v. State*, 798 N.E.2d 510, 517 (Ind.Ct.App. 2003). Once deliberations have begun, however, removal of a juror is warranted only in the most extreme situations where it can be shown that (1) the juror's removal is necessary to protect the integrity of the process; (2) the juror's removal does not prejudice the deliberations of the rest of the panel; and (3) the juror's removal does not impair the defendant's right to a trial by jury. *Riggs v. State*, 809 N.E.2d 322, 327–28 (Ind.2004). To establish that a defendant's right to an impartial jury is not infringed, the trial court must establish

the record to support the removal of a deliberating juror. *Id.* at 329.

### B.  Proper Removal of Juror

During deliberations, the bailiff informed the trial court that Juror Number Eight "was having a breakdown and she wanted to come out of [the jury room]." Tr. at 1013.  The trial court brought the jury into the courtroom and admonished them as follows:

> Ladies and gentlemen, some information has been brought to the attention of the Court, and we've been doing research to try to deal with the proper procedure about how to handle it.  What we're going to do is question one of you outside the presence of the rest of you, and those of you who are sent back to the jury room, which will be everybody except our juror number [eight], you are admonished at this point you may not deliberate.  You may not discuss the case back in the jury room until the jury is back together.  And you may not discuss what we're discussing in here or what you think we're discussing in here or anything else.  So everyone except our juror number [eight] will be sent back to the jury room with the Court's instruction at this point, you may not deliberate on the cases [sic] until further order from the Court.

Tr. at 1022–23.

Juror Number Eight was then examined as follows:

> [COURT]:  All right.  [Juror,] you've communicated to [the bailiff] a concern you have about further deliberation, is that true?
>
> [JUROR]:  Uh huh.  Yes.
>
> [COURT]:  All right.  And I need to ask you a question.  Do you understand you took an oath to try the case?
>
> [JUROR]:  Yes.

> [COURT]:  Okay.  And is that something that you are willing to do, deliberate with your fellow jurors?
>
> [JUROR]:  I've tried.
>
> [COURT]:  Okay.  Are you refusing to deliberate with them?
>
> [JUROR]:  No.
>
> [COURT]:  Okay.  Are you willing to continue deliberating with them?
>
> [JUROR]:  I'm not able.
>
> [COURT]:  Okay.  And when you say you're not able, I don't want you to talk about the substance of the conversations, but just from your perspective can you tell us why you're not able?
>
> [DEFENSE]:  I'm sorry, Judge, and I don't mean to interrupt, but could the record reflect that juror number [eight] is visibly shaken and she is crying?
>
> [COURT]:  Yes, ma'am—yes, sir, it will.
>
> [DEFENSE]:  Thank you.
>
> [COURT]:  Go ahead.
>
> [JUROR]:  Because I can't determine somebody's fate, I can't.
>
> [COURT]:  Okay.
>
> [JUROR]:  I can't.
>
> [COURT]:  Okay.
>
> [JUROR]:  That's why.
>
> [COURT]:  All right.  All right.  Do you understand as a juror you have the right to vote your conscience?  You have to answer out loud, I'm sorry.
>
> [JUROR]:  Yes.
>
> * * *
>
> [DEFENSE]:  You, you can't, you can't vote your conscience?
>
> [JUROR]:  I can't.  I can't.
>
> [DEFENSE]:  And that is because?
>
> [JUROR]:  I cannot live with the consequences.  It's just something I, I'm not fit to do.  There are people that

are fit to make those kinds of decisions, and I've never been in this, this predicament before, and I'm just not fit to make that decision. I just can't.

* * *

[COURT]: When [defense counsel] asked you if you could vote your conscience[,] was your answer I can, or I cannot?

[JUROR]: I can't.

[COURT]: I can't?

[JUROR]: No, I can't.

[COURT]: Okay. Okay, all right. And do you believe you're unable to serve on this jury?

[JUROR]: Yes, I'm unable to serve.

[COURT]: All right. Thank you. You will be excused.

Tr. at 1024–26, 1032.

LeFlore objected to the removal of Juror Number Eight and moved for a mistrial, claiming that because Juror Number Eight was the only African–American left on the jury, LeFlore was denied his right to a jury venire that represented a cross-section of the community. The trial court denied LeFlore's motion and replaced Juror Number Eight with an alternate juror. The trial court then called the jury back into the courtroom and admonished the jurors as follows:

Ladies and gentlemen, [Juror Number Eight] has been excused from service by the Court. [Alternate juror], you are now a member of the regular jury panel. Ladies and gentlemen, the, the fact of [Juror Number Eight's] excuse by the Court and/or the reasons for it are not the proper subject of deliberations, but you may begin your deliberations, or resume your deliberations at this time

with [the alternate juror] being permitted to participate.

Tr. at 1033.

■ LeFlore now contends that the trial court failed to make an adequate record to support the removal of Juror Number Eight. However, LeFlore did not object to Juror Number Eight's removal because the trial court's reasons for removing the juror were inadequate; instead, LeFlore objected to Juror Number Eight's removal because she was the last remaining African–American on the jury, and her removal denied LeFlore his right to a jury venire that represented a cross-section of the community. For this reason, LeFlore has waived this issue on appeal.

■ Waiver notwithstanding, the trial court established the record to support the removal of Juror Number Eight. After admonishing the jury, the trial court examined Juror Number Eight about why she should be excused from service. Juror Number Eight told the trial court that she was unable to continue to deliberate because she could not in good conscience make a decision about another person's fate. Thus, under Indiana Trial Rule 47(B), Juror Number Eight was unable to perform her duties as a juror. LeFlore had an opportunity to examine the juror and, in fact, did so. LeFlore never showed that the rest of the jury panel's deliberations would be prejudiced, or that his right to an impartial jury was infringed. Therefore, the trial court did not err in replacing Juror Number Eight with an alternate juror.

## II. Admission of Recorded Phone Conversations

LeFlore next contends that the trial court erred in admitting into evidence three cassette tapes that contained copies of phone conversations that were recorded at the jail between LeFlore and his broth-

er, Shabaka. More specifically, LeFlore contends that the State failed to establish the authenticity of the recorded phone conversations. The State counters that the parties had stipulated to the authenticity of the recorded phone conversations. We agree with the State.

On the first day of trial, the State informed the trial court that it had tendered to LeFlore a proposed agreement to stipulate to the testimony of Shawn Helmer, a police officer who had retrieved and copied recordings of numerous telephone conversations between LeFlore and Shabaka while LeFlore was in jail awaiting trial. At the time of trial, Officer Helmer was working as a police officer in Florida. The State requested the stipulation in order to avoid having to make arrangements to fly Officer Helmer to Indiana to testify about the authenticity of the recorded phone conversations. Defense counsel responded to the proposed stipulation as follows:

> [DEFENSE]: I received a copy of the stipulation about that, Judge, and it appears to be acceptable—
>
> [COURT]: Okay.
>
> [DEFENSE]: —and what, what we agreed on.
>
> [COURT]: Okay, great.
>
> [DEFENSE]: However, we might need to amend it to indicate that Mr. Helmer recovered a number of phone calls from the jail, but, however, there are only three phone calls that are of interest in this case.
>
> [COURT]: Okay.
>
> [STATE]: That's fine with me.

Tr. at 8.

On the third day of trial, the parties discussed with the trial court the stipulation they had reached regarding the authentication by Officer Helmer of the recorded phone conversations. At that time, defense counsel did not raise any objection to the stipulation. In fact, defense counsel stated, "Now, regarding the, the three cassettes [of the recorded phone conversations], I'm prepared to stipulate to those...." Tr. at 374.

Subsequently, the State offered into evidence the three cassette tapes, which contained copies of the recorded phone conversations, during the State's direct examination of Indianapolis Police Department Detective Lesia Moore. LeFlore objected to the admission of the cassette tapes into evidence, arguing that the State had not established the authenticity of the recorded phone conversations on the cassette tapes. The trial court overruled the objection, finding that LeFlore had stipulated to the authenticity of the cassettes on the first day of trial.

■■■ It was not error for the trial court to admit the cassette tapes into evidence. The record shows that on at least two separate occasions at trial, LeFlore stipulated to the authenticity of the tapes. "A party entering into a stipulation with the consent of the other party is bound to the facts so stipulated." *Lyons v. State*, 431 N.E.2d 78, 80 (Ind.1982). Therefore, LeFlore is estopped from denying the authenticity of the recorded phone conversations, and the trial court did not err in admitting the recorded phone conversations into evidence. *See id.* (holding that party estopped from denying authenticity of document where party earlier stipulated to its authenticity).

### III. Transcripts of Recorded Phone Conversations

LeFlore next contends that the trial court erred in allowing the State to use the transcripts from LeFlore's recorded phone conversations with Shabaka to impeach Shabaka's testimony at trial because the

transcripts were unverified and unauthenticated. We disagree.

At trial, the following colloquy occurred:

[STATE]: I want to direct your attention to May 10 of 2003. You had a telephone conversation with [LeFlore], isn't that right?

\* \* \*

[SHABAKA]: Yes. I mean, if you say so. I mean, I don't—

[STATE]: All right. And during that phone call you discussed with [LeFlore], a beamer, right?

\* \* \*

[SHABAKA]: Yes.

[STATE]: And a beamer is, when you're talking with [LeFlore] you're talking about a gun, isn't that right?

[SHABAKA]: My gun.

\* \* \*

[STATE]: Do you remember during that May 10, 2003, conversation telling, asking [LeFlore] if it's okay to have the beamer?

[SHABAKA]: I don't remember.

[STATE]: I'm going to show you what's been marked as State's Exhibit 37. Would you take a moment to look over State's 37? Do you recognize that, sir?

[SHABAKA]: Yeah, I see it.

[STATE]: Is that a transcript of the phone call that you made with [LeFlore] May 10 of 2003?

[SHABAKA]: That's what it seems.

[STATE]: All right. And on page 1 of that transcript do you see where it says, ["]why you didn't, why you

didn't tell me I could keep the black beamer, why you say I could keep the black beamer, man.["] Do you remember saying that?

[SHABAKA]: No, but it says it right there, so I had to have said it.

[STATE]: And then [LeFlore] says, ["]you can, right? You can, man.["] Is that what [LeFlore] says?

\* \* \*

[SHABAKA]: Yeah.

Tr. at 570, 573–74. Thereafter, LeFlore objected to use of the transcript by the State because it was unverified and unauthenticated. The trial court overruled LeFlore's objection, concluding that because the transcript was being used by the State for impeachment purposes and the State was not moving to admit the transcript into evidence at that time, authentication of the transcript was not required. We agree.[1]

■ Indiana Evidence Rule 613 provides, in pertinent part,

(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or

---

1. A similar colloquy subsequently occurred between the State and Shabaka regarding a phone conversation Shabaka had with LeFlore on June 21, 2003. LeFlore objected to use of the transcript by the State on the same grounds, and the trial court again overruled LeFlore's objection, finding that the State was not required to authenticate the transcript because it was being used for impeachment purposes only and not being offered into evidence at that time.

the interests of justice otherwise require.

Rule 613 does not require that the prior statement be authenticated before it can be used for impeachment purposes and when the State is not moving to admit the statement into evidence at that time. Nevertheless, LeFlore cites to *Hightower v. State*, 735 N.E.2d 1209 (Ind.Ct.App. 2000), *trans. denied*, to support his contention. In *Hightower*, a defendant moved to admit into evidence a facsimile of a letter written by a witness who testified at trial. The defendant attempted to admit the facsimile into evidence in order to impeach the witness, but the trial court denied the defendant's motion because the facsimile had not been authenticated. On appeal, we held that the trial court did not err in denying the defendant's motion to admit the facsimile into evidence. *Id.* at 1215.

LeFlore claims that *Hightower* supports his argument that the trial court improperly allowed the State to use the transcripts from the recorded phone conversations to impeach Shabaka. However, the State did not attempt at that time to admit the transcripts into evidence; instead, the State simply asked Shabaka if he had made particular statements from those recorded phone conversations. Thus, *Hightower* is inapposite; the State was not required to authenticate the transcripts at that time.

### IV. *Corpus Delicti* Requirement

LeFlore's final contention is that the State failed to present any evidence independent of LeFlore's confession that Farries died during the course of an attempted robbery. We disagree.

#### A. Standard of Review

■ The *corpus delicti* requirement seeks to prevent the admission into evidence of a defendant's confession to a crime that never occurred. *Johnson v. State*, 785 N.E.2d 1134, 1140 (Ind.Ct.App. 2003), *trans. denied.* Thus, in Indiana a crime may not be proven based solely upon a confession; instead, independent evidence of the crime is required. *Id.* This evidence need not prove that a crime was committed beyond a reasonable doubt; rather, the evidence must merely provide an inference that a crime was committed. *Id.* This inference may be established by circumstantial evidence. *Id.*

#### B. Sufficient Evidence of *Corpus Delicti*

The State presented sufficient evidence at trial from which it could be inferred that Farries died during the course of an attempted robbery. At trial, Hart testified that Farries approached him at the Speedway gas station about buying marijuana. Hart told Farries that he was interested in buying marijuana, but he needed to get some money. Hart testified that he then asked Farries to follow him in his car to get some money. Farries agreed, and LeFlore and Farries followed Hart in LeFlore's car. Hart drove to a church parking lot across from his mother's house. Hart testified that at that point, LeFlore and Farries approached Hart, carrying guns, and demanded that Hart empty his pockets and give them his necklace. After he complied, Hart heard LeFlore tell Farries that they should "do this white boy in," at which point Hart knocked LeFlore's arm away, causing the gun LeFlore was holding to discharge. Hart ran to his mother's house; when he looked back, LeFlore was driving away. Police later found Farries dead in the church parking lot from a gunshot wound to the head.

■ Hart's mother testified at trial and corroborated Hart's testimony. She testified that on the night of the shooting, she began walking towards the church parking lot and saw Hart standing there with two men. She saw one of the men

pull on Hart's necklace and point a gun at Hart's head. At this point, Hart's mother yelled at the men to find out what was going on. She testified that she then observed Hart push the man's arm away from his head, and she heard a gun discharge. She ran back to her house and called the police. Thus, the State satisfied the *corpus delicti* requirement by presenting evidence independent of LeFlore's confession that Farries died during the course of an attempted robbery.

### Conclusion

We hold that the trial court did not err when it excused a juror from service during deliberations. Moreover, the trial court properly admitted the recorded phone conversations into evidence because LeFlore had earlier stipulated to their authenticity. Additionally, the trial court did not err when it allowed the State to use transcripts of the recorded phone conversations to impeach Shabaka's credibility. Finally, the State satisfied the *corpus delicti* requirement by presenting evidence independent of LeFlore's confession that Farries died during the course of an attempted robbery. For these reasons, we affirm LeFlore's convictions.

Affirmed.

RILEY, J., and CRONE, J., concur.