**Scott D. RECTOR, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

No. 64A03–0410–CR–458.

Court of Appeals of Indiana.

April 20, 2005.

Matthew D. Soliday, Deputy Public Defender, Valparaiso, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Appellant, Scott D. Rector, was convicted of one count of Burglary as a Class C felony[1] and was determined to be an habitual offender. Upon appeal, Rector challenges his adjudication as an habitual offender,[2] presenting two issues for our review: (1) whether the trial court erred in removing a juror after deliberations had begun in the habitual offender phase of the trial, and (2) whether the trial court erred in refusing to give the jury an instruction requested by Rector.

We affirm the judgment entered upon the habitual offender determination.

The record reveals that Rector was charged with burglary on March 31, 2003. On November 18, 2003, the State filed an information alleging that Rector was an habitual offender. A jury trial commenced on April 6, 2004, at the conclusion of which the jury found Rector guilty of burglary as charged. On April 29, 2004, the jury was reconvened to begin the habitual offender phase of the trial. After the State presented its evidence and the parties had made their respective arguments, the jury was sent to deliberate. The transcript reveals that the trial court was eventually informed that the jury was unable to reach a unanimous decision and that one of the jurors had brought a booklet into the jury room. According to the court bailiff, the juror, later identified as Juror Number 11,

was passing the booklet around and "had at least one other one." Tr. at 311.

The booklet, which has been included in the record, is titled "Citizens Rule Book," with the subtitles of "Bill of Rights" and "Jury Handbook." Exhibits Vol. at 19. Included in the booklet are copies of the Declaration of Independence and the Constitution of the United States, along with "indices"[3] to these documents. The booklet contains almost twenty pages of text describing and encouraging jury nullification and emphasizing the historic right of the jury to determine both the law and facts in criminal cases. The booklet includes quotes from several of the Founding Fathers, Abraham Lincoln, various quotes taken from opinions of the United States Supreme Court, and references to the Ten Commandments. Among the headings in the booklet are "Jury Duty," "You Are Above the Law!," "Law of the Land," "Ten Commandments," "Communist Manifesto," "Give up Rights?," "Jury Tampering?," "Patrick Henry Shocked," "Jury of Peers," "Freedom for William Penn," and "Jefferson's Warnings!" The booklet could be mildly described as "libertarian" in tone, with anti-communist, religious references. The booklet decries an alleged infringement in recent times upon the rights of jurors to act as a final obstacle to the abuse of governmental power.

The trial court described the booklet as "inappropriate" and was concerned that it had been in the jury room during deliberations in the guilt phase of the trial. Tr. at 312. The trial court decided to "bring [the jury] in, and . . . ask if anybody—ask who brought this in and when it came. And I think that to bring this in is arguably

---

1. Ind.Code § 35–43–2–1 (Burns Code Ed. Repl.2004).

2. Rector does not challenge his burglary conviction upon appeal.

3. These indices could better be described as outlines.

improper conduct, and whoever the juror is should be excused and replaced with the alternate." Tr. at 312. Rector's counsel expressed concern over the court's plan, stating, "at this point, I don't think the defendant would agree to seating the alternate after this sort of thing has occurred." Tr. at 313. The trial court then stated that it was either going to "seat an alternate or [declare] a mistrial." Tr. at 313. After further discussion, the State expressed no objection to seating the alternate. The trial court then brought the jury back into the courtroom, and the following colloquy occurred:

"THE COURT: Mr. Foreman, I have some questions, if I could ask you, please.

FOREMAN: Yes, ma'am.

THE COURT: You've indicated that the jury is hung in this case, yet I have also received from the bailiff a little handbook here. Did this come from a member of the jury?

JUROR [NO. 11]: It came from me, Your Honor.

THE COURT: Well, I'm talking to him (Indicating).

FOREMAN: It belongs to one of the members of the jury, and it was at one end of the table. I'm not sure who brought it into court and used it.

THE COURT: Was it utilized today?

FOREMAN: I believe the person who indicated that it belonged to was reading it.

THE COURT: Okay. But did it show up today?

FOREMAN: Oh, yes.

THE COURT: Not yesterday.

FOREMAN: Not that I know of yesterday, I know today.

THE COURT: Today for the rest of the group. Just today, not yesterday.

(Several jurors respond in the affirmative.)

THE COURT: The—this is material that is not a part of the instructions and is not a part of the evidence in the case.

FOREMAN: Absolutely.

THE COURT: And I need to know if those of you who are here—let me find a better way to say that. I believe that the introduction of this piece of material into the procedure is bringing in outside material for your considerations [sic], and Mr. Juror No. 11, if this was a material [sic] that you brought in for use in considering a verdict, that is probably not appropriate juror conduct; and it would, therefore, be appropriate for the Court to excuse you from service. Okay? And the Court will do that. Okay? This is your material, is it not, sir?

JUROR [NO. 11]: Yes, it is.

THE COURT: So you will be excused from service, and I will let you go with the bailiff.

JUROR [NO. 11]: Your Honor, may I make a comment?

THE COURT: Well, I'm concerned about tainting my panel. So if you have something you would like to say, you may say it in writing to the Court in the future.

JUROR [NO. 11]: I heard you say the word may. Would probably—

THE COURT: I have excused you, sir. Thank you.

(Juror No. 11 exits the courtroom.)

JUROR [NO. 11]: May I have my book back?

THE COURT: Actually I will need to retain your book for the Court's record on this case. Everything—every piece of paper that comes through

here I retain a record of. Mr. Alternate Juror, would you take the 11th chair. Well, a jury is certainly not required to return a verdict in the case. Okay? I would ask that you just take a little bit more time to consider the evidence without the cloud of extraneous material. And I would ask you if you believe that it will be possible for you—if you're able to reach a decision—I'm not telling you [that] you have to, okay, but if you're able to come to a verdict, could you base it exclusively upon the evidence and the law in this case and not something outside the record? I'm going to go down the jury box numerically to be sure that my record is clear.

[All jurors respond in the affirmative].

THE COURT: With that, you still have the jury instructions for the final phase. I believe that there had been a question possibly by the alternate juror, and it's very difficult for the court to answer individual questions. But I will tell you that the answer to your question is in the instruction. The instruction is written—every instruction is written the way it is for a reason, okay? . . . .

\* \* \*

So, Mr. Foreman, I will command the jury back to the jury room and ask you to just take one more review of the law and the evidence, and then let us know. Is that fair?" Tr. at 314–318.

Rector's counsel then made it clear that he did not consent to the seating of the alternate juror. The trial court then stated, "I consider it to have been highly improper for Juror No. 11 to bring extraneous material into the jury room and utilize that in an attempt to influence deliberations, and I think that in doing so, he

violated his oath. And I will retain the [booklet] for the record. . . ." Tr. at 319.

Thereafter, the trial court was informed that the jury had reached a verdict, at which time Rector's counsel moved for a mistrial based upon the seating of the alternate juror. The jury was brought back into the courtroom, and the verdict was read finding that Rector was an habitual offender. On June 1, 2004, Rector was eventually sentenced to seven years incarceration upon the burglary conviction, which was. enhanced by eleven years as a result of the habitual offender determination.

Upon appeal, Rector claims that the case of *Riggs v. State*, 809 N.E.2d 322 (Ind.2004), requires that we reverse his habitual offender adjudication. The State also bases its argument upon the holding in *Riggs*. Because of the importance of this case, we will examine it in some detail.

In *Riggs*, the defendant was charged in 2000 with murder, felony murder, rape, and criminal deviate conduct after DNA tests connected him with the 1985 murder and sexual abuse of a fifteen-year-old girl. Approximately four hours after deliberations had begun, the jury foreman sent a note to the trial court that one of the jurors had become "belligerent." *Id.* at 324. The foreman was brought into the courtroom and further explained to the trial judge his concern that the juror, later identified as Mr. Wallace, was only "marginally" participating in deliberations. *Id.* However, when questioned by the trial court as to what he meant by "belligerent," the foreman explained that nothing "physical" was going on, but he was concerned that physical violence might occur. *Id.* at 325. The trial court then asked if Mr. Wallace had fairly participated in the deliberations so far, to which the foreman replied, "Yes." *Id.* The problem, it seemed, was simply that Mr. Wallace had reached

an opinion and refused to "budge" from his position. *Id.* The foreman also told the court that he did not believe that further deliberations would yield a unanimous verdict.

After the foreman had been excused from the courtroom, Riggs moved the trial court to declare the jury hung and grant a mistrial. The State requested that Mr. Wallace be removed from the jury and replaced with an alternate. The trial court then recalled the foreman back into the courtroom, and the foreman explained that deliberations had essentially ceased. The trial court asked if Mr. Wallace's conduct was such to cause fear to other jurors. The foreman replied, "Yes. Fear of violence? Yeah." *Id.* But soon thereafter, the foreman clarified, "I don't think any of the jurors are physically fearing [Mr. Wallace], I mean most of the jurors are not willing to work with that juror because of the way they feel." *Id.* He further explained that Mr. Wallace was "not willing to work with any of the other jurors to talk out the various different charges." *Id.* The foreman was again excused, and the trial court eventually brought Mr. Wallace into the courtroom to question him.

Mr. Wallace proceeded to explain to the trial court that other jurors were accusing him of "defending" Riggs and that he was not "going to take that." *Id.* at 326. When asked by the court what he meant by this, Mr. Wallace explained, "I don't have to because I'm trying to give a fair and impartial determination to this evidence and to this Court." *Id.* When asked what he intended to do about this situation, Mr. Wallace stated that he asked to see the judge. The State again requested that Mr. Wallace be replaced by the alternate. The trial court denied Riggs's re-

quest to poll the jury as to whether they could reach a verdict. Instead, the court, concerned about Mr. Wallace's demeanor and the bailiff's report that the jurors had been "screaming," decided to dismiss Mr. Wallace and replace him with the alternate. *Id.* The trial court recalled the jury to the courtroom and told them of its decision to remove Mr. Wallace and replace him with the alternate. He also asked each juror, in the presence of the others, if Mr. Wallace's removal would interfere with their ability to render a fair and impartial verdict, to which each responded, "no." *Id.* Riggs unsuccessfully moved for a mistrial, and the jury eventually returned with a verdict of guilty as to the charges of murder and criminal deviate conduct and not guilty as to the charges of felony murder and rape.

■ Riggs appealed, claiming that Mr. Wallace's removal from the jury after deliberations had begun violated Riggs's constitutional right to an impartial jury and that the record did not support removal. Upon transfer,[4] our Supreme Court noted the traditional standard of review for challenges to removal of jurors. The *Riggs* court noted, however, that removal of a juror after deliberations have begun is a different issue than removal of a prospective juror from a venire or removal during trial. *Id.* at 327–28. The court stated that removal of a juror after deliberations have begun ultimately remains a matter requiring deference to the trial court's judgment, but further explained that such "raises a number of considerations not present before deliberations begin. As a result, it demands a carefully developed record as to the grounds for removal and also requires precautions to avoid inappropriate consequences from the removal." *Id.* at

---

**4.** In an unpublished memorandum decision, a panel of this court affirmed Riggs's convictions upon direct appeal. *See Riggs v. State,*

No. 49A02–0112–CR–879, 783 N.E.2d 1284 (Ind.Ct.App. Feb.20, 2003), *trans. granted.*

327. Once deliberations have begun, discharge of a juror is warranted only in the most extreme situations where it can be shown that the removal of the juror (1) is necessary for the integrity of the process, (2) does not prejudice the deliberations of the rest of the panel, and (3) does not impair the party's right to a trial by jury.[5] *Id.* at 327–28.

 The court stated that, in the case before them, the record did not establish that Mr. Wallace's conduct was improperly influencing the rest of the panel. *Id.* at 328. "A failure to agree, however unreasonable, is a ground for mistrial, not removal of the obstacle to unanimity." *Id.* (citing *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir.1988)). Removal of a juror for actual misconduct requires more than a refusal to negotiate further. *Id.* The court explained that "[i]f there were a showing of physical confrontation, or attempts to intimidate other jurors, then removal may be permissible[,] . . . [b]ut this record does not establish these extreme modes of conduct." *Id.* Although the *Riggs* court noted that trial courts should attempt to avoid hung juries and mistrials, such policy "does not permit removal of a juror simply because the juror does not agree." *Id.* The court further observed that in the case before it, although the potential for violence was at best unclear, "[w]hat [was] clear [was] that the removal of the juror had the effect of removing a pro-defense juror who, after the jury had deliberated, appeared likely to create a hung jury." *Id.* Mr. Wallace had explained to the trial court that "he was trying to fulfill his role as a juror and was making a decision based upon the evidence." *Id.* Although there was some indication that Mr. Wallace had been rude

and intransigent, there was no record establishing "physical threats, intimidation or other conduct justifying removal." *Id.* Therefore, the *Riggs* court held that removal was improper. *Id.*

Noting that the State complained that Riggs had failed to develop a record establishing prejudice, the court wrote that although it agreed that a thorough record was necessary to establish grounds for removal, it was not up to the parties to show prejudice as to the outcome:

> "Unjustified removal is structural error, just as much as denial of the right to an impartial jury. As the United States Supreme Court put it in *Gray v. Mississippi*, 481 U.S. 648, 668 [107 S.Ct. 2045, 95 L.Ed.2d 622] (1987), 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right.' Moreover, to establish that the right is not infringed, the trial court must establish the record to support removal of a deliberating juror, just as a record is required to establish bias of a prospective juror." *Id.* at 328–29.

 The *Riggs* court then set forth general procedures for removal of jurors after deliberations have begun:

> "Finally, it is important to note that removal of a deliberating juror raises several issues not present in striking a juror in voir dire. Steps may also be required in addition to establishing the grounds for removal. The inquiry into the need to remove a juror may result in the juror's continuing to serve on the panel, so the trial court must avoid questioning that may affect the juror's judg-

---

**5.** The court observed that in some jurisdictions, a mistrial is required if a juror is removed after deliberations have begun. *Id.* at

328 (citing *State v. Adams*, 320 N.J.Super. 360, 727 A.2d 468, 471 (App.Div.1999)).

ment. Moreover, the trial court must be careful not to convey improper messages, either verbal or silent, to the other jurors, who may infer that the juror was dismissed because of his or her view of the case. Here, the trial court judge asked each juror, in the presence of the full jury, whether the removal of the juror would 'in some way interfere' with the juror's 'ability to reach a fair and impartial verdict,' to which each responded 'no.' This general inquiry did not focus sufficiently on the problem of the potential effect of the removal on the jury. A juror might well conclude that the removal of Wallace implied disagreement with Wallace's views on the merits of the case. Removal should be accompanied by an instruction that removal in no way reflected approval or disapproval of the views expressed by the juror." *Id.* at 328–29 (citations omitted).

■ Several things are apparent from our reading of the opinion in *Riggs*. One thing is abundantly clear—removal of a juror after deliberations have begun involves different concerns than removal of a juror during trial or during voir dire. Removal after deliberations have begun is warranted in only the "most extreme" situations when it is necessary to the integrity of the process and does not impair the right to a fair trial by jury. *Id.* at 327–28. Although the *Riggs* court did not explicitly detail all types of situations which might meet this high standard, it did hold that the failure to agree and the refusal to negotiate further are not enough to justify removal. *Id.* at 328. The court also stated that physical confrontation or attempts to intimidate other jurors might justify removal. *Id.*

While the current appeal was under consideration, another panel of this court addressed a somewhat similar issue. In *Le-*

*Flore v. State*, 823 N.E.2d 1205 (Ind.Ct. App.2005), *trans. pending*, the defendant claimed that the trial court erred in removing a juror after deliberations had begun. In that case, one of the jurors, Juror Number Eight, was "having a breakdown," and wanted to leave the jury room. *Id.* at 1209. The trial court judge examined that juror and discovered that she was not refusing to deliberate but thought she was unable to do so. *Id.* The juror felt that she was not fit to make a decision about the defendant's fate and that she could not "live with the consequences." *Id.* The juror even stated that she could not vote her conscience. *Id.* at 1210. The trial court then removed her from the jury and replaced her with an alternate. *Id.* LeFlore objected and moved for a mistrial, claiming that because the dismissed juror was the only African–American left on the jury, the defendant was being denied his right to a jury representing a cross-section of the community. The trial court denied the motion for a mistrial and admonished the jury as follows:

"Ladies and gentlemen, [Juror Number Eight] has been excused from service by the Court. [Alternate juror], you are now a member of the regular jury panel. Ladies and gentlemen, the, the fact of [Juror Number Eight's] excuse by the Court and/or the reasons for it are not the proper subject of deliberations, but you may begin your deliberations, or resume your deliberations at this time with [the alternate juror] being permitted to participate." *Id.* (alterations in original).

Upon appeal, LeFlore claimed that the trial court failed to make an adequate record to support removal of the juror. The *LeFlore* court disagreed. First, the court held that LeFlore had forfeited his claim:

"LeFlore did not object to Juror Number Eight's removal because the trial

court's reasons for removing the juror were inadequate; instead, LeFlore objected to Juror Number Eight's removal because she was the last remaining African–American on the jury, and her removal denied LeFlore his right to a jury ... that represented a cross-section of the community." *Id.*

Waiver notwithstanding, the court held that the trial court had established a record to support the removal of the juror in that she was unable to perform her duties as a juror. *Id.* Thus, while the *LeFlore* court did not engage in an analysis of *Riggs,* likely because the defendant had forfeited his claim, the trial court in that case did instruct the jury that the removal of the juror and the reasons for removing the juror were not to be considered by the jury.

■ The situation presented to the trial court in this case was difficult at best. Juror Number 11 took the booklet into the jury room and apparently displayed it and its contents to the other jurors. This manifested a proclivity toward jury nullification of the applicable law as contained in the instructions from the court. Under the circumstances, the trial court faced the dilemma of declaring a mistrial upon the habitual offender charge or replacing the offending juror by the alternate. It was presented with a delicate task of balancing the available options.[6]

■ Even though Rector's habitual offender determination had not yet become final at the time the *Riggs* case was decided, we decline to apply *Riggs* to this case. The doctrine of retroactive application of a new rule of law as enunciated in *Teague v. Lane,* 489 U.S. 288, 299, 109 S.Ct. 1060, 103 L.Ed.2d 334, (1989), is required only when the new rule is a "new *constitutional* rule of criminal procedure ...." (emphasis supplied). We do not perceive the determination in *Riggs* that "[r]emoval [of a juror during deliberations] *should be* accompanied by an instruction that removal in no way reflected approval or disapproval of the views expressed by the juror" to be a new *constitutional* rule. (emphasis supplied). To be sure, the suggestion by the *Riggs* court has implications with respect to the fairness and impartiality of a prospective verdict.[7] However, the decision in *Riggs* does not mandate such an instruction in all cases. Furthermore, it does not imply that without such an instruction a verdict would be necessarily tainted by the removal of the juror.

Here, it is patently obvious that the remaining jurors and the alternate juror were aware that the disqualified juror had been removed for taking the "Citizen's Rule Book" into the jury room and for displaying it and its message content to the other jurors. We can think of no instruction which could state or imply that the trial judge approved of the booklet or its call for jurors to ignore the law.

It would be sheer sophistry to assume that any instruction would totally clear the

<hr>

6. We have no doubt that the trial court was vitally aware of the ramifications of her decision in the matter. She acted carefully and with concern for the impact of Juror Number 11's conduct upon the other jurors and upon the fairness and impartiality of any determination to be made by the reconstituted jury. This is especially true in light of the fact that Riggs had not yet been decided at the time of Rector's trial. Thus the trial court here did

not have the benefit of the cautionary guidance of that case.

7. We note that Rector's claim in this case is directed to the decision to remove Juror Number 11. Rector characterizes that juror as being "pro-defense." Rector does not assert that the alternate juror was unqualified to render a fair and impartial verdict or that the remaining jurors were prejudicially biased against him.

incident from the minds of the jurors. Furthermore, and more importantly, each of the remaining jurors and the alternate clearly stated that they could render a verdict without "the cloud of extraneous material . . . [and] base it exclusively upon the evidence and the law in this case. . . ." Tr. at 316–17. We are unable to think of anything more protective of a fair and impartial verdict that the trial court could have done under the circumstances, short of the drastic and disfavored declaration of a mistrial. The inquiry made of the remaining jurors and the alternate was adequate under the circumstances, even in light of the *Riggs* decision.

The trial court was not in error in failing to anticipate the suggestion (as opposed to a constitutional mandate) of the *Riggs* court to give the remaining jurors and the alternate a cautionary instruction merely cumulative of what the jury had been told by the trial court during the proceedings at which the alternate was seated and before the jury was retired for renewed deliberations.

■ In a separate argument, Rector claims the trial court erred in failing to give the jury an instruction he requested. In reviewing the exercise of the trial court's discretion to refuse tendered instructions, we consider: (1) whether the proposed instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the proposed instruction is covered by other instructions which were given. *Henderson v. State*, 795 N.E.2d 473, 477 (Ind.Ct.App. 2003), *trans. denied.* Here, in discussing the final instructions to be given the jury in the habitual offender phase of the trial,

Rector informed the trial court that he wished to have Article 1, Section 19 of the Indiana Constitution given as an additional instruction. That provision states, "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." The trial court did not give Rector's requested instruction but did give the jury an instruction which read:

"You are finders of the facts and the law that applies to this case, being guided by these instructions given by the Court. You should, however, find both the law and the facts as they are, not as you would like them to be. You do not have the right to make, repeal, disregard, or ignore the law as it now exists." App. at 38.[8]

Upon appeal, Rector claims that the holding in *Warren v. State*, 725 N.E.2d 828 (Ind.2000), requires that we reverse his habitual offender determination because the trial court did not instruct the jury that they were the finders of the law and facts as a preliminary instruction. Rector misreads the holding in *Warren*. Although the situation before that court concerned preliminary instructions, the holding of that case was not concerned with a distinction between final or preliminary instructions: "We hold today, that when a defendant requests the trial court to instruct the jury on its role as finders of law and fact during the habitual offender phase of a trial, it is reversible error for the trial court to refuse the request." *Id.* at 837. Here, the trial court did so instruct the jury during the habitual offender phase of the trial. Moreover, the substance of Rector's proposed instruction was covered by the instruction given by the trial court.

8. In *Holden v. State*, 788 N.E.2d 1253, 1255 (Ind.2003), *aff'd on reh'g*, 799 N.E.2d 538, *cert. denied*, 541 U.S. 1048, 124 S.Ct. 2170, 158 L.Ed.2d 741 (2004), our Supreme Court, quoting from *Bivins v. State*, 642 N.E.2d 928, 946 (Ind.1994), held that "a jury has no more right to ignore the law than it has to ignore the facts in a case."

The judgment of the trial court is affirmed.

BAILEY, J., and MATHIAS, J., concur.