**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**DANIELLE L. GREGORY**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROMERO LESLIE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1203-CR-135 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Peggy R. Hart, Master Commissioner
Cause No. 49G20-1106-FA-42647

**November 21, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Romero Leslie appeals his conviction for dealing in cocaine, as a Class B felony, following a jury trial. Leslie presents two issues for our review:

1. Whether the trial court committed fundamental error when it denied Leslie's request that the court dismiss a juror who, during a recess, had been standing near Leslie and defense counsel while they were discussing trial strategy.

2. Whether the trial court abused its discretion when it replaced a juror with an alternate juror after deliberations had begun.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On June 19, 2011, the State charged Leslie with dealing in cocaine, as a Class A felony, and possession of cocaine, as a Class B felony. Prior to trial, the State moved to amend the charging information to allege that Leslie had committed dealing in cocaine, as a Class B felony, and possession of cocaine, as a Class D felony, and the trial court granted that motion. In the course of the trial, during a recess, a juror, Kim Shiflette, left the jury room unaccompanied and walked into a hallway outside the courtroom in violation of the bailiff's instructions. Shiflette was standing in the hallway near Leslie, who was conversing with his defense counsel about trial strategy, for approximately five to ten seconds before Leslie and his defense counsel observed her and stopped talking.

The bailiff reported the incident to the Commissioner, who asked Leslie's defense counsel for details about Shiflette's encounter with Leslie and his defense counsel. The following colloquy ensued:

THE COURT: Okay ma'am we were just on break here. And it was my understanding that Mr. Smith [bailiff] had checked on you folks [jury] and asked if anybody needed to—if anybody needed anything or needed to go outside and smoke or anything like that. He indicated that everyone said no. He shut the door. He said that he went to the hallway, and at which time he saw Mr. Moore [defense counsel] and his client talking privately and then he saw you. So apparently you left the jury room. Correct?

JUROR SHIFLETTE: That's correct.

THE COURT: Okay, without permission.

JUROR SHIFLETTE: I guess so. Not wanting to do anything bad, but yes.

THE COURT: Okay, so we are not going to do that again. Right?

JUROR SHIFLETTE: Absolutely not.

THE COURT: Okay. Well let me ask you this, when you left the jury room, and you went out into the hallway did you see Mr. Moore?

JUROR SHIFLETTE: I—

THE COURT: Mr. Moore the defense attorney?

JUROR SHIFLETTE: I remember seeing her but I don't remember seeing him.

THE COURT: Okay, okay. So you saw Miss Coleman who is also defense attorney here?

JUROR SHIFLETTE: The blonde, yeah.

THE COURT: Okay. And you saw her. Did you see anybody else?

JUROR SHIFLETTE: I mean there were other people out there but I don't know who.

THE COURT: Okay.

JUROR SHIFLETTE: I was just looking for him.

THE COURT: And "him" meaning the bailiff Steve Smith?

3

JUROR SHIFLETTE:    That's correct.

THE COURT:    Okay. Did you hear any conversations that anybody was having? Did you over hear [sic] anybody's conversation?

JUROR SHIFLETTE:    No, I did not.

THE COURT:    You did not?

JUROR SHIFLETTE:    No.

THE COURT:    Okay, so the only person that you recognized for sure is Miss Coleman who is a defense attorney and you don't remember her saying anything or having any kind of contact?

JUROR SHIFLETTE:    No, I don't remember. I mean people were talking, there was noise but I don't remember anything that was—I didn't hear anything that was said.

THE COURT:    Okay.

JUROR SHIFLETTE:    I was just looking for him and then he had this look on his face like—oh, my god.

THE COURT:    And when you say "he" once again just so we have the correct meaning Mr. Smith.

JUROR SHIFLETTE:    He, Mr. Smith.

THE COURT:    And he looked at you like oh, my god.

JUROR SHIFLETTE:    He looked at me like oh, my god what are you doing. And he told me did you not understand what I said. And I said I did not.

THE COURT:    Okay. All right [sic], just a moment okay. Parties want to approach or do you have any questions of her or—you're okay?

MS. PROPS [STATE]:    I have no questions, Judge.

THE COURT:    You're okay?

MR. MOORE:    No, no questions.

4

THE COURT: You're okay? Okay. Then I'll tell you what we don't do approach (sic), I'm just going to excuse her and put her back in the jury room[.] Okay, Ma'am I am going to excuse you right now. I'm going to put you back in the jury room. And this conversation that we've had here in open court we are going to keep to ourselves. So don't communicate this to the other jurors. Or what was asked of you or what was said if you don't mind.

JUROR SHIFLETTE: Okay.

THE COURT: Okay, and obviously we are just gonna' [sic] keep moving forward I think and—it's not—it's no business of theirs what this conversation was, okay?

JUROR SHIFLETTE: Okay. I apologize.

THE COURT: That's okay, that's okay. I just wanted to make sure. That you didn't hear or see anything, that the other's [sic] didn't [']cause [it's] so important to keep you together as a group. Unless you were going to be separated with Mr. Smith at all times and that's what—that's what the issue was though. Okay.

JUROR SHIFLETTE: I understand.

Transcript at 196-99. Shiflette returned to the jury room, and Leslie's counsel agreed with the State that Shiflette seemed very genuine and had just wanted a cigarette. Leslie did not object or request any further action, and the trial proceeded.

At the conclusion of evidence, the trial court submitted the case to the jury. Approximately forty-five minutes into deliberations, another juror, Kermetha Brown, wrote a note to the trial court stating: "I realize that I am not comfortable in my spirit with deciding whether a person is guilty or not guilty. I would like for the alternative [sic] to step in. I'm extremely uncomfortable. Kermetha Brown." Transcript at 308. The State moved to strike Brown from the jury, but Leslie objected. As a result, the trial court called Brown out of the jury room, and the following colloquy took place:

5

THE COURT: Good evening, Miss Brown. All right [sic], I just wanted to let you know that the Court is in receipt of your letter and I did share it with the parties. And I just have a couple of questions for you. Okay?

JUROR BROWN: Uh huh.

THE COURT: Can you maybe elaborate a little more?

JUROR BROWN: Honestly I feel that I'm just not comfortable. I realize just sitting in the room (indiscernible) yea or nay. I don't care if somebody was on trial for stealing bubble gum. I don't know, I'm just not comfortable with somebody's life. And me being in control of making a decision.

THE COURT: Okay, you understand that—You have a duty now, you are charged with a duty that you sat through this entire trial okay, right?

JUROR BROWN: Yes, I understand.

THE COURT: Okay. And you are to evaluate the evidence and based upon the evidence to render a verdict or [sic] either guilty or not guilty. Do you understand that that's what your duty is?

JUROR BROWN: Right, I understand.

THE COURT: Okay. And are you saying that you cannot fulfill that at this point in time?

JUROR BROWN: I'm—

THE COURT: You know, I'm—cause [sic] I don't think anybody is—in this courtroom would say to you right now, hey this is a real easy thing to do.

JUROR BROWN: Right.

THE COURT: Go do it. Or this is a piece of cake, or this is a walk in the park. Don't think that any of us are suggesting that.

JUROR BROWN: Right.

THE COURT: So I—I—I—I understand that you are uncomfortable.

6

JUROR BROWN:   I realize how hard the job is.  Yes.

THE COURT:       Yeah, and—and we realize it too.  So—and it is a job.  You know, so I guess what I am asking can you do this job?  I know that its uncomfortable but just because something is uncomfortable doesn't necessarily mean that we can't do it.  Does that make sense?

JUROR BROWN:   Right.

THE COURT:       So that's what I am trying to figure out.

JUROR BROWN:   I mean I've been here like what fourteen—thirteen, fourteen hours.

THE COURT:       Sure.

JUROR BROWN:   And it's like—

THE COURT:       But you just started deliberating less than forty-five minutes ago.

JUROR BROWN:   Right.  And I strongly feel like I just—don't want to be, you know, involved with the whole—the deliberation part.  I'm very uncomfortable.

THE COURT:       Okay.  I understand that you are uncomfortable.  But can you put that aside and render a decision based upon the evidence, [']cause once again I know that just because something is uncomfortable doesn't mean that we can't do it, so that's what I am asking you.  Despite the fact that you are uncomfortable, can you—can you render a decision?

JUROR BROWN:   I feel like I can't, that's why I wrote the letter.

THE COURT:       You cannot?

JUROR BROWN:   Right.

THE COURT:       So based upon the deliberation, or the state of delib— you feel that you cannot join in those deliberations and make a decision is that what you are telling me?

JUROR BROWN:   Yes.

7

Transcript at 311-14. The court then held a private discussion with counsel at the bench, after which the State asked Brown whether anyone was putting pressure on her during deliberations. Brown responded in the negative. Leslie's counsel then questioned Brown further:

> [DEFENSE COUNSEL]: Thank you. Ma'am, Miss Brown you understand that as part of your duties as juror you're – you've agreed to at least collaborate with the folks back there and listen to what they have to say. Express yourself, keep an open mind and make a decision regarding the evidence. No one is asking to make that decision about a person. Knowing that do you think that you can still do your job (unintelligible) to the other juror (sic).
>
> JUROR BROWN: I do understand that part. About going off the evidence. And that's how you—
>
> [DEFENSE COUNSEL]: Right.
>
> JUROR BROWN: (inaudible). I just don't really feel comfortable at all.
>
> [DEFENSE COUNSEL]: What specifically is making you feel uncomfortable? What—what's changes [sic] since you went you went [sic] back there?
>
> JUROR BROWN: I'm just—you know how you just feel like there is something just—come over me like I just don't want to do—you know—
>
> [DEFENSE COUNSEL]: Right. [The State] asked you if you felt pressure, do you feel peer pressure just to make a decision?
>
> JUROR BROWN: No. I don't feel peer pressure at all. I don't even know the people back there.
>
> [DEFENSE COUNSEL]: Okay. Okay, thank you.
>
> THE COURT: Okay, once again despite the fact that you feel uncomfortable, you still think that you cannot render a decision just because you're uncomfortable, its unpleasant?
>
> JUROR BROWN: That's how I feel.

8

THE COURT:    How do you feel, tell me again.

JUROR BROWN: Just uncomfortable you know, with making the decision.

THE COURT:    Okay, but despite the fact that you are uncomfortable, or that making a decision may be unpleasant are you saying that you just can't make it period?  Or that you will make a decision but it is going to be very painful.

JUROR BROWN: I feel like I can't make it, period.

THE COURT:    Okay.  You cannot make a decision period?

JUROR BROWN: Right.

THE COURT:    All right [sic].  Any other questions, Miss Props, on these questions.

[STATE]:    No.

THE COURT:    Mr. Moore?

[DEFENSE COUNSEL]:   No.

THE COURT:    All right [sic], ma'am I'm going to excuse you.  I am going to put you back into the jury room.  Please do not discuss with them anything that took place here.

JUROR BROWN: Okay.

Transcript at 316-19.  The trial court took the matter under advisement for a few minutes. The court subsequently excused Brown from the jury, over Leslie's objection, and replaced her with the alternate juror.

Following further deliberations, the jury returned a verdict finding Leslie guilty on both counts.  The trial court entered judgment of conviction on dealing in cocaine, as a Class B felony, and sentenced Leslie accordingly.  Leslie now appeals.

9

## DISCUSSION AND DECISION

## Issue One: Failure to Dismiss Juror

Leslie contends that the trial court erred when it denied his request that the court dismiss Shiflette because she had been standing near Leslie and defense counsel while they were discussing trial strategy during a recess. Leslie did not raise this issue at the trial court and, therefore, it is waived. To avoid waiver, Leslie contends that the failure to dismiss Shiflette constitutes fundamental error. As this court has stated on several occasions:

> The fundamental error doctrine is extremely narrow. Sandifur v. State, 815 N.E.2d 1042, 1046 (Ind. Ct. App. 2004), trans. denied. To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. Id. Further, the error must constitute a blatant violation of basic principles, the harm, or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. Id.

Rowe v. State, 867 N.E.2d 262, 266 (Ind. Ct. App. 2007).

In cases alleging juror misconduct involving out-of-court communications with unauthorized persons, a rebuttable presumption of prejudice exists. May v. State, 716 N.E.2d 419, 421 (Ind. 1999) (citation omitted). Such misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred and that it pertained to a matter pending before the jury. Id. (citation omitted). Typically, the trial court is in the best position to assess the honesty and integrity of a juror and his ability to perform as a conscientious, impartial juror. See id. (internal quotations and citation omitted). This is especially true where the trial judge must weigh the nature and extent of a juror relationship with a party or witness established pre-trial

and arising in the normal, and often inevitable, course of interaction in an employment or community environment. Id. (citations omitted). As such, our review of the trial court's decisions in these matters is highly deferential. Id. (citations omitted).

Cases where convictions have been reversed due to socialization between a juror and an unauthorized person contemporaneous with the trial include Woods v. State, 233 Ind. 320, 119 N.E.2d 558 (1958), and Kelly v. State, 555 N.E.2d 140 (Ind. 1990). In Woods, we reversed a conviction following denial of a motion for mistrial where, in part, police officer witnesses had mingled with jurors in the jury room during breaks in the trial. 119 N.E.2d at 561. And in Kelley, the jurors were instructed not to discuss the case with anyone, but six of the jurors ate lunch with the State's witness. The trial court questioned three of the jurors, and all stated that they could remain unbiased. But the supreme court held: "Despite the lack of clear evidence that the security guard and the jurors discussed the trial proceedings and despite the three jurors' assertions that their impartiality was intact, the enhancement of the credibility of the prosecution's witness seems highly probable, regardless of whether the jurors themselves realized it at the time." Id. at 142. As a result, the court reversed the conviction and remanded for a new trial.

A different outcome occurred in Morris v. State, 508 N.E.2d 11 (Ind. 1987). There, a juror left the juror room during a recess, in direct violation of the bailiff's instructions, to run an errand in the courthouse. She was later seen exiting a stairwell, and the victim and her aunt exited the same stairwell a short time later. Both the victim and her aunt testified that they did not have any conversation with the juror, and the juror

denied having any conversation with the victim or her aunt. Our supreme court held that such contact "did not parallel [that in] the Woods case in any way." Id. at 14. As such, the court found no reversible error. Morris, 508 N.E.2d at 14.

Here, Shiflette left the jury room in violation of the bailiff's instructions. She stood unaccompanied in the hallway near Leslie and his counsel for five to ten seconds before Leslie's counsel noticed her. The defendant and his attorney had been discussing the facts of the case and trial strategy. But, upon noticing Shiflette, they stopped talking and moved to a room off the hallway. About the same time, the bailiff noticed Shiflette, returned her to the jury room, and informed the trial court of the incident.

In the presence of both parties but outside the presence of the other jurors, the trial court questioned Shiflette about whether she had had any contact with Leslie. Shiflette maintained that she had only left the jury room to look for the bailiff to get permission to smoke; that she had not recognized Leslie or his lead attorney in the hallway; that the only person she recognized was Leslie's other attorney, Miss Coleman; and that she had not overheard any conversation. Leslie's attorney also stated that he did not know if Shiflette had overheard anything, nor did he object to her remaining on the jury or request any other relief.

We find the facts in the present case resemble more closely those in Morris than in Woods or Kelley. Woods and Kelley each involved actual contact between one or more jurors and one or more witnesses. But here, as in Morris, the evidence does not show any direct contact between the juror and one or more unauthorized persons. Indeed, Shiflette denied overhearing any conversation or even recognition of Leslie or his lead counsel.

12

Leslie argues that Shiflette's testimony in that regard is "unbelievable," Appellant's Brief at 19, but we must defer to the trial court on that point. Indeed, even Leslie's trial counsel voiced doubts over whether Shiflette had heard anything. Leslie has not shown error, if any, that denied him fundamental due process.

**Issue Two: Replacement of Juror**

Leslie next contends that the trial court abused its discretion when it replaced one of the jurors with an alternate after deliberations had already begun. Removal of a juror after deliberations have begun is ultimately a matter requiring deference to the trial court's judgment, but it raises a number of considerations not present before deliberations begin. Riggs v. State, 809 N.E.2d 322, 327 (Ind. 2004). Therefore, although the removal and replacement of a juror during deliberations is still within the trial court's discretion, "that discretion is more limited" when removal occurs after deliberations have begun. Lichti v. State, 927 N.E.2d 82, 91 (Ind. Ct. App. 2005) (citing Riggs, 908 N.E.2d at 327). It demands a carefully developed record as to the grounds for removal and requires precautions to avoid inappropriate consequences from the removal. Riggs, 908 N.E.2d at 327. Thus, once deliberations begin, discharge of a juror is warranted only in the most extreme situations where it can be shown that the removal of the juror is necessary for the integrity of the process, does not prejudice the deliberations of the rest of the panel, and does not impair the parties' right to a trial by jury. Id. at 327-28.

In Riggs, after four hours of deliberations, the foreman notified the trial court that one juror was being "belligerent," was "marginally" participating in deliberations, and was refusing to change his mind. Id. at 324-25. A short time later, after asking to speak

13

with the court, that juror said that he was "trying to give a fair and impartial determination to [sic] this evidence and to this Court." Id. at 326. Riggs moved for a mistrial, but the State requested that the juror be replaced. The trial court granted the State's request. The jury, now including the alternate, deliberated further and convicted Riggs of murder and criminal deviate conduct.[1] On appeal, we held that removal was improper because the record did not establish that the juror's conduct was improperly influencing the rest of the panel. "A failure to agree . . . is a ground for mistrial, not removal of the obstacle to unanimity." Id. at 328.

Similarly, in LeFlore v. State, we affirmed the removal of a juror in a felony murder case. 823 N.E.2d 1205, 1210 (Ind. Ct. App. 2005). When the trial court questioned the juror outside the presence of the other jurors, she was visibly shaken and crying. The trial court asked whether the juror could vote her conscience, and she stated that she could not live with the consequences and answered that she was unable to serve. Id. at 1210. We held that LeFlore had waived the argument that the trial court had failed to make a record to support removal of the juror because LeFlore had raised a different argument below. We also observed that LeFlore had not shown that his right to an impartial jury was infringed. Id.

The juror here and the juror in LeFlore are similarly situated. Brown repeatedly told the trial court that she was "not comfortable," particularly that she was "not comfortable with somebody's life" and "being in control of making a decision" about that. Transcript at 311. And when the trial court asked her if she was able to make a

---

[1] The jury acquitted Riggs of felony murder and rape charges.

14

decision, she answered that she could not. Based on her responses, the trial court excused her from the jury and replaced her with the alternate. The trial court then instructed the jury, including the alternate, "not to speculate unto [sic] any reason why juror [Brown] has been dismissed" and asked them to continue deliberations. Id. at 327.

In essence, the trial court determined that Brown's inability to make a decision as a juror affected the integrity of the process. We cannot say that the court abused its discretion in reaching that determination. See LeFlore, 823 N.E.2d at 1210. And Leslie has not shown that replacing Brown on the jury prejudiced the deliberations of the rest of the panel or impaired his right to a trial by jury. See Riggs, 908 N.E.2d at 327-28; Leslie, 823 N.E.2d at 1210.

Finally, Leslie contends that the trial court's questioning of Brown led her to make "statements toward an inability to deliberate, when she had not previously indicated she could not render a decision." Appellant's Brief at 14. We cannot agree. After Brown repeatedly stated that she was uncomfortable, the trial court reminded Brown of her duty as a juror and asked specifically whether she could make a decision based on the evidence. The question was fair, not leading, and to the point. Brown's answer in the negative confirmed that her continued service on the jury was problematic. Leslie has not shown that the trial court abused its discretion when it dismissed Brown from the jury.[2]

---

[2] Leslie also contends that the dismissal of Brown violated his right to a fair and impartial jury under Batson v. Kentucky, 476 U.S. 79 (1986). But Leslie does not support that contention with cogent argument. Therefore, it is waived. See Appellate Rule 46(A)(8)(a).

**Conclusion**

Leslie has not shown that the trial court committed fundamental error when it denied his request to dismiss Shiflette from the jury. Nor has Leslie shown that the court abused its discretion when it dismissed Brown from jury service after she stated that she could not render a decision based on the evidence. As such, we affirm Leslie's conviction for dealing in cocaine, as a Class B felony.

Affirmed.

KIRSCH, J., and MAY, J., concur.