UNITED STATES of America, Appellee,

v.

Miguel HERNANDEZ, Dwayne McCorn, Edgar Rodriguez, William Perez, Jean Pierre, Aurea Gonzalez, Luis Garcia, Lillian Perez, Carlos Hernandez, Tito Lugo, Heriberto Guzman, Edwin Rivera, Louis Torres, Jenny Lopez, Victor Quinones, Nelson Ortiz, Elizabeth Castillo, Ida Bermudez, Dolores Colon, Jimmy Romero, Defendants,

Victor Quinones, Luis Garcia, a/k/a "Weo", Edgar Rodriguez, a/k/a "Ston", William Perez, a/k/a "Willo", Jean Pierre, Carlos Hernandez, and Lillian Perez, a/k/a "Lee", Defendants–Appellants.

Nos. 1357, 1393, 1394 and 1403 to 1406, Dockets 88–1017, 88–1041, 88–1042, 88–1051, 88–1052, 88–1126 and 88–1142.

United States Court of Appeals, Second Circuit.

Argued Aug. 16, 1988.

Decided Nov. 21, 1988.

Leonard J. Levenson, New York City, for defendant-appellant Edgar Rodriguez.

Alan G. Polak, New York City, for defendant-appellant William Perez.

Jesse Berman, New York City, for defendant-appellant Victor Quinones.

Bernard S. Greenbaum, Brooklyn, N.Y., for defendant-appellant Luis Garcia.

David L. Lewis, New York City, for defendant-appellant Carlos Hernandez.

Gerald J. McMahon, New York City, for defendant-appellant Lillian Perez.

Allen Lashley, Brooklyn, N.Y., for defendant-appellant Jean Pierre.

Gregory J. O'Connell, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., John Gleeson, Emily Berger, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee U.S.

Before WINTER and MINER, Circuit Judges, and BILLINGS,* District Judge.

WINTER, Circuit Judge:

This case had its origins in the spring of 1986, when Roberta Rivera, an undercover Special Agent with the Drug Enforcement Administration, made purchases of heroin in the Bushwick section of Brooklyn. Over the course of several months, Rivera bought many thousands of dollars' worth of heroin from a number of individuals. Her investigation ultimately resulted in the seizure of a large body of drugs, weapons, drug records and drug paraphernalia and the indictment of nineteen individuals. Of the nineteen, "Shorty" Gonzalez pleaded guilty before trial and testified for the government. Appellant Victor Quinones and eleven others either pleaded guilty or had their cases severed for trial.

Appellants Edgar Rodriguez, William Perez, Jean Pierre, Luis Garcia, Lillian Perez and Carlos Hernandez were tried before a jury and were convicted of conspiracy to distribute, and to possess with intent to distribute, heroin in violation of 21 U.S.C. § 846 (1982). Garcia was also convicted of three counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1) (1982). The appellants were convicted by an eleven-person jury that rendered its verdict after one juror had been excused pursuant to Fed.R. Crim.P. 23(b) on grounds of mental incompetence. The juror was excused after four days of deliberations, at a point when the jury was deadlocked eleven to one in favor of conviction. The removed juror was the sole vote for acquittal. Because we believe the removal of the juror was error in the circumstances of this case and that the remaining members of the jury could not render a properly considered verdict, we reverse.

Quinones entered a guilty plea before trial and was sentenced under both 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(C). He claims that the district judge failed to consider probation as an appropriate sentence. We disagree and affirm.

### 1. *The Removal of Juror No. Four*

Even before the jury had been impaneled, concerns about Juror No. Four emerged. After the initial *voir dire* of No. Four, the prosecutor, whose peremptory challenges had been exhausted, informed the court that the juror had been observed speaking with a female spectator in the courtroom before being summoned to the jury box. The government moved to remove No. Four. Counsel for Lillian Perez objected and the court denied the motion. Before opening arguments, the prosecution again moved that No. Four be removed. The prosecutor reported that the woman spectator with whom No. Four had spoken was the girlfriend of Carlos Hernandez, one of the defendants, and that No. Four had later been observed winking, smiling and nodding his head at the defendants. Counsel for Rodriguez objected, and the court, after a *voir dire* of No. Four, denied the government's motion.

Juror No. Four remained a source of controversy. On the first day of trial, the court admonished him to pay attention to the proceedings. The next morning, before the jury was brought in, Judge Bartels expressed misgivings about the juror:

Gentleman, I am a little worried about juror number four. As you noted yesterday I had to tell him to pay attention. He was talking to juror number three. I understand he has kicked the chair of juror number three and juror number one had to reprimand him.

A juror was heard by my law clerk stating, as going back to the jury room, that he was a weirdo.

* Hon. Franklin S. Billings, Jr., United States District Judge for the District of Vermont, sitting by designation.

The government again moved for removal of Juror No. Four. Counsel for Lillian Perez again objected, and the court again denied the motion.

The jury began its deliberations about noon on November 16, 1987. Within an hour, Judge Bartels received a note signed by all the jurors except No. Four, stating:

> We the jury in the case feel that Juror No. Four Frank Schwartz has a prejudice and lacks the rational common sense to deliberate in a logical way. The individual wants to start a case against the government in a conspiracy charge.

> Because of the first deliberation attempts are futile, we would like one alternate to replace juror ... Four Frank Schwartz.

A variety of motions followed. Counsel for the defendants jointly moved for a mistrial. The government moved that No. Four be removed pursuant to Fed.R.Crim.P. 23(b).[1] Judge Bartels apparently decided to grant this motion. After stating, "it's obvious that we cannot continue with Juror No. Four ... [u]nder the circumstances, I think that I have to discharge Juror No. Four," Judge Bartels contacted an alternate juror and arranged for her to come in the next morning. Counsel for Edgar Rodriguez proposed that a court-appointed psychiatrist examine No. Four before any action was taken under Rule 23(b). The judge then decided to conduct another *voir dire* of No. Four. Before he could do so, however, a second note was received from the jury, which stated:

> During deliberation, Juror No. Four Frank Schwartz requested to know whether the lack of evidence which he believed was a basis for consideration of the case [sic]. At that time, we advised Juror No. Four that he reword his letter to the judge from "we" to "I" because all the jurors already understood.

At that time, Juror No. Twelve advised Juror No. Four to change the letter. At the time, Juror No. Four then threw water in Juror No. Twelve's face. Juror No. Seven tried to stop Juror No. Four who struck out at Juror No. Seven, he twisted Juror No. Seven's arm.

The court then conducted the second *voir dire* of No. Four. The juror stated that he threw the glass of water only after another juror had assaulted him. After the *voir dire*, defense counsel again moved for a mistrial, and the government again moved that Juror No. Four be removed. The district judge then apparently decided to declare a mistrial and tried to schedule a new trial with all counsel. An agreement on a date could not be reached, however. Abandoning both the arrangement to bring in the alternate juror and the decision to declare a mistrial, the judge then called in the jury and asked them whether they could deliberate "in a calm manner." Upon assurances from the foreperson that they could, Judge Bartels allowed the jury to continue its deliberations.

The following morning, the second day of deliberations, Judge Bartels gave some supplemental instructions. At the conclusion of these instructions, Juror No. Four made his presence known again, asking in effect for a charge on single versus multiple conspiracies. After the judge stated, "Only one conspiracy in the indictment can be considered. Any other conspiracy is not considered," the jury resumed its deliberations.

During a colloquy with counsel on matters not pertinent to this appeal, Judge Bartels introduced an entirely new element:

> What bothers me now is what is going on in that jury room. I am tempted to take some action on this man—one way or the other, I have to take some action if it's true that he was discharged as a soldier

---

1. That rule reads:

 (b) *Jury of Less Than Twelve.* Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

because of mental problems. That will just add to his prior conduct which shows that he was not fit to serve on a jury. I will immediately discharge him and let eleven jurors proceed, if they want to proceed any further.

It bothers me to know what is going on there.

From later statements in the record, we gather that a juror had told a courtroom clerk that Juror No. Four had stated to the other jurors that he had been discharged from the armed services for psychiatric reasons. The clerk had then conveyed this information to the judge.

The prosecution suggested that Juror No. Four be questioned about the circumstances of his discharge and about possible psychological problems. Notwithstanding the judge's own expressed conviction that he should "take some action" and the prosecutor's suggestion concerning another *voir dire* of No. Four, Judge Bartels decided "to wait and [see] what I am going to do if there is a hung jury. I won't cross the bridge now." Later that day, Juror No. Four requested a readback of post-arrest statements, but otherwise called no particular attention to himself. During the early evening, the other eleven jurors sent out a note declaring that "we are making some progress with Juror No. 4. Please bear with us as we don't want a mistrial. We are working hard with Juror No. 4."

The third day of deliberations, November 18, passed relatively uneventfully. The next day, however, two more notes were received. The first presented the court with ballots on the three counts against defendant Garcia, signed by all eleven jurors except No. Four, who had written on the ballots "will not sign." In an accompanying note, the other jurors asked whether Juror No. Four could rescind a vote he had cast the previous day. The court responded by charging that a juror could indeed change his or her mind. The jury's next, and final, note read as follows:

Judge Bartels, we the 11 jurors feel that it was unfair to us that we had to work with a "mentally incompetent person," Juror No. 4, Frank Schwartz.... [W]e

... were able to sacrifice our own emotional frame of mind and we tried and we tried and we tried to reach Juror No. 4 on every level. Each juror reviewed the evidence with him in detail.

In a calm non-emotional way his sense of reason could not be found. We gave you evidence that he ... signed letters saying he made a clear decision that, Frank Schwartz, Juror No. 4, would vote on the conspiracy charges against all defendants and signed each verdict. He signed a statement that he would not change his mind, in front of the entire jury.

The defendants' motion for a mistrial and the government's motion to remove No. Four were then renewed. The government also suggested that the court examine Juror No. Four once more to get a "lead" on whether a professional psychological evaluation of that juror might be readily available. Judge Bartels thereupon decided to attempt one more *voir dire* of No. Four. Evidently, however, he expected to declare a mistrial, for he had the jury called in and addressed them as follows:

I have your note and I supposed everyone has read it or heard it, including Juror No. 4. There is no necessity for me to read it again. I first—I'd like to answer one question as to why we didn't accept an alternate. Legally it was too late. The Court set an alternate before the trial began. Secondly, I wanted to talk degree with the jurors with respect to their efforts to try, try, try again to persuade Juror No. 4, and I think they ought to be commended for their efforts. Also, I appreciate the fact that you made quite a big sacrifice not to stay home, to serve as a juror and neglect their personal affairs, their business affairs just to try to prevent a mistrial. And, of course, it's true, thousands of dollars are lost on a mistrial and I believed the jury realized among, many, many other things that since they began right at the beginning to reach a conclusion that hereafter they would try to convince Juror No. 4, in order to prevent the loss of so much time and money, they couldn't do it. Nevertheless, this accord, on behalf of this Court, wishes to express its deep

appreciation for the effort to prevent mistrial.

I don't think we had a jury—I don't think I had in some 27 years, had such a conscientious jury.

I think you can feel proud of yourselves in attempting to serve your country and to serve the community and to go the extra mile in order to help us, you have. I wish to express my deep appreciation to all of you. I know it's been hard. I know it's been hard and I'm awfully sad.

Now, I want to talk to Juror No. 4 about five minutes. I'm going to ask the jury to stay back in its jury room and I'm going to ask Juror No 4 to come around to my chambers. And I'll talk to you again, ladies and gentlemen of the jury, as soon as I finish this five-minute talk.

During this final *voir dire*, Juror No. Four stated that he had been discharged from the Navy on account of a psychiatric disability, which he described as "not fit[ting] in" and as a "neurosis." It also emerged that No. Four was still receiving disability payments for his "neurosis." The court then dismissed Juror No. 4 pursuant to Fed.R.Crim.P. 23(b). The court did not put any findings on the record at that time. Instead the judge called the jury back in and stated:

I have a situation which I never encountered before where the Court, in its discretion, decided whether it should proceed further with the eleven jurors. I am reading, I have Rule 23, the Rules of Criminal Procedures. Part of it says, "Even absent a stipulation, if the Court finds it necessary to excuse juror for just cause after the jury has retired and/or considers its verdict and in the discretion of the Court a valid verdict may be returned by the remaining eleven jurors.["] That's the basis on which I can excuse this Juror No. 4.

Now, after discussion with Juror No. 4, I found that he had been discharged from the Navy as being unsuitable. That was after he was sent to a psychiatrist and there was a psychiatric report.

He has now been discharged honorably for a disability of neurosis. He's suffering from a neurosis and he is getting paid by the government for this disability. He has no job. He says he will discontinue his disability stipend and try to get a job. He apparently has no way of contacting his brother, who is in the Air Force and One, and his sister who lives somewhere in New Jersey. The actual conclusion is, one, that this person is not an eligible juror and that he should be excused and removed.

Now, we couldn't do this earlier in this proceeding, otherwise, it would have been done. We also have the testimony of his queer action, by the jurors themselves, and under the circumstances I am excusing this juror and letting a verdict to be rendered by 11 jurors, and to do that, however, I want to be sure of any verdict that the 11 jurors reached, is reached independently and they will have just a short period to go in the jury room and decide whether they want to reach a verdict, and they can protest, they can ignore completely anything they said before, and I don't need to give you the charge.

After counsel for the defendants objected to the phrase "a short period," Judge Bartels had the jury called back once again and instructed them to "take such time as necessary to a reasonable conclusion." The jury went out once again, and, after about a half hour of deliberations, returned verdicts of guilty against all defendants.

 We believe the removal of Juror No. Four on the fourth day of deliberations, when he was the sole hold-out for an acquittal, was error. We do not reach the question of whether the district judge's finding of mental incompetence was adequately supported by the evidence to meet the "for just cause" requirement of Rule 23(b), although we do note that the juror's conduct before the trial began in winking and smiling at the defendants after having conversed with one of their girlfriends would have justified excusal for cause at that time.

Our decision rests instead on three interrelated considerations: (i) it is not clear in the record that the removal was because of mental incompetence rather than to avoid a hung jury; (ii) if removal for mental incompetence was justified, it should have occurred at the latest on the second day of deliberations; and (iii) the statements of the district judge just prior to the removal of No. Four prevented the remaining jurors from reaching a properly considered verdict.

■ That a juror may not be removed because he or she disagrees with the other jurors as to the merits of a case requires no citation. Moreover, removal of the sole holdout for acquittal is an issue at the heart of the trial process and must be meticulously scrutinized. In the present case, we cannot be confident that Juror No. Four's disagreement with his colleagues was not the cause of his removal. On the first day of deliberations, before the report of the fight in the jury room, the district judge announced that deliberations could not continue with No. Four and even arranged to have an alternate report the next morning. That approach was undoubtedly abandoned because of the numerous, and perhaps insurmountable, difficulties in attempting to substitute a discharged alternate after deliberations have begun. Fed. R.Crim.P. 23 advisory committee's note to 1983 amendment. The next day, having learned that Juror No. Four might have been discharged from the armed forces for psychiatric reasons, the judge again expressed the opinion that No. Four was unfit for service on the jury. Nevertheless, he decided to wait and see whether the jury could reach a unanimous verdict. Only when the jury deadlocked two days later did the court remove him.

■ We believe the grounds for that removal are unclear. The question of No. Four's discharge from the armed services had been raised two days earlier and, if it was important to pursue an inquiry into that discharge, the time to do it was when it first entered the picture rather than to "wait and [see] ... if there is a hung jury." Moreover, the final *voir dire* itself added little to the evidence of the juror's mental incompetence other than confirmation of the fact of discharge and a conclusory description of its cause, "neurosis" and "not fitting in." The government's proposal, to inquire whether a professional psychological evaluation of No. Four might be readily available, was not pursued by the district court. The record thus seems to reflect that the cause of the removal was as much to avoid a mistrial because of a hung jury as to excuse an incompetent juror. Clarification of this matter might be available through a remand, but we believe that other interrelated reasons are, in any event, grounds for reversal.

■ If Juror No. Four was excusable for mental incompetence, the removal should have taken place no later than the second day of deliberations when his discharge from the armed services for psychiatric reasons became known. The confirmation of that discharge and the additional information obtained two days later that it was caused by "neurosis" and "not fitting in" not only added little, but were also ascertainable, on the second day. Once the issue of mental competence was raised, it should have been confronted and resolved rather than put off "to wait and [see] what I am going to do if there is a hung jury." If No. Four was mentally incompetent, his continued participation resulting from the failure to remove him at an early stage clearly poisoned the jury's deliberations by transforming them from an open-minded discussion to an arduous debate with No. Four that could only have hardened the views of the other eleven. We appreciate that the district judge allowed No. Four to continue out of a sense of fairness to the defendants at a time when defense counsel were openly and unfairly accusing him of a lack of fairmindedness. We also appreciate that the defendants waived whatever challenges they may have had to No. Four's continuing to serve. In doing so, they bore the risk that No. Four might polarize his colleagues against him but thereafter relent and vote to convict. Their waiver, however, did not encompass

the option of postponing resolution of the issue until the jury was deadlocked.

 Finally, whatever small possibility existed of continuing with the remaining eleven jurors on the fourth day was eliminated by the district judge's remarks to the jury just before he conducted the final *voir dire* of No. Four. Those remarks praised the eleven lavishly for their efforts to persuade No. Four to vote to convict. The judge told them that thousands of dollars would have been wasted in the case of a mistrial and that he regarded their efforts so highly that he considered them to be the most conscientious jury he had encountered in twenty-seven years on the bench. These remarks might have been appropriate if, as seems likely, he intended to declare a mistrial. If, however, the eleven were to be sent out again to deliberate, such remarks were the last things that should have been said. The previous deliberations had consisted largely of a polarizing and exhausting struggle with Juror No. Four, and the remaining jurors hardly needed to hear that the judge believed they were right and that Juror No. Four was wrong. We appreciate that when the district judge made these remarks, he apparently was anticipating a mistrial rather than continued deliberations.[2] Nevertheless, the effect was surely to eliminate any possibility that the remaining eleven jurors could resume deliberations with an open mind.[3] We therefore reverse and remand.

2. Appellants' failure to object to the judge's statements is excused in light of the fact that they appeared to be preliminary to the declaration of a mistrial rather than to continued deliberations. We also note that the judge's later statements to the jury as to his reasons for excusing Juror No. Four were inappropriate. While findings as to an excusal under Rule 23(b) are necessary, they need not be made to the remaining jurors. Appellants did not object, however.

3. Appellants have raised several other claims that may be renewed at a new trial. We address them now in the interests of judicial economy.

All appellants claim that Judge Bartels's exclusion of the period April 30, 1987 to September 8, 1987 from the calculations required by the Speedy Trial Act, 18 U.S.C. § 3161, was improper. This claim too is without merit. A ruling excluding delay under the Speedy Trial Act is reversible only on a showing of abuse of discretion. *United States v. Ruggiero*, 726 F.2d 913, 925 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). Judge Bartels granted the exclusion under the complex case exception of the Speedy Trial Act, 18 U.S.C. § 3161(h)(8)(B)(ii) (1982). It was hardly an abuse of discretion to hold a nineteen-defendant case to be complex.

Appellants also raise a number of claims connected with the trial. Relying upon *United States v. Scop*, 846 F.2d 135 (2d Cir.), *reh. granted on other grounds*, 856 F.2d 5 (1988), they challenge the admission of expert testimony by two government agents that clarified and interpreted drug records. In *Scop*, however, an expert who had been intimately involved in the investigation testified as an expert and made "statements embodying legal conclusions," drawn "directly upon the language of the statute." *Scop*, 846 F.2d at 139, 140. The testimony here, however, was clearly of a factual nature.

Garcia claims that his motion for severance of his trial was improperly denied. However, his claim fails to meet the standard enunciated in *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). Garcia also raises meritless challenges to the admission of evidence from his apartment and of a gun seized from the drawer of his bedroom dresser. The government established an adequate foundation for the admission of evidence from Garcia's apartment, and firearms are relevant evidence in narcotics cases. *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Garcia also challenges the court's refusal to give the jury an identification charge. Such a decision lies in the discretion of the court, *United States v. Luis*, 835 F.2d 37, 41 (2d Cir.1987), and given the considerable eyewitness testimony as to Garcia's participation in the alleged conspiracy, the court did not err in refusing the requested charge.

Finally, Hernandez challenges Judge Bartels's refusal to give the jury a charge on multiple versus single conspiracies. Hernandez claims that the principal evidence linking him to the conspiracy charged in the indictment was the testimony of "Shorty" Gonzalez, who testified that she supplied him with heroin during the summer of 1986. The physical evidence seized from his apartment, however, long postdated any connection with "Shorty" Gonzalez, and therefore might constitute evidence of participation in a separate conspiracy. This claim too is devoid of merit. There was adequate evidence to support an inference that Hernandez participated in the conspiracy alleged in the indictment, even if only during the summer of 1986. As we have repeatedly stated, "'a single conspiracy is not transposed into a multiple one simply by lapse of time, [or] change in membership.'" *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.1988) (quoting *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979),

### 2. Quinones's Appeal

Appellant Quinones challenges his sentence of five years' imprisonment and six years' supervised release, claiming that Judge Bartels employed an impermissibly "fixed and mechanical approach" to sentencing as evidenced in his stating, *inter alia*, that "we cannot have any drug case where we give probation." *See United States v. Schwarz*, 500 F.2d 1350, 1352 (2d Cir.1974). We decline to upset Quinones's sentence of imprisonment, however, although we delete his term of supervised release.[4] The seemingly rigid language used by the district judge occurred after defense counsel had made an argument that tended to underplay the seriousness of Quinones's offense. We decline to give the judge's statements literal meaning. Judge Bartels showed flexibility in his sentencing, giving widely varying terms to the various defendants. We believe his remarks must be read in the context of the facts of this case, which involved a widespread and serious conspiracy involving heroin. Quinones has offered us no reason to separate these remarks from the factual context in which they were made or to believe that probation should have been given serious consideration in his case.

We therefore reverse and remand all appeals but that of Quinones, which we affirm.

---

*cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980)). Hernandez thus cannot show the "substantial prejudice" required by *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir.1982).

4. Although appellant Quinones has not raised the issue, the government has conceded that supervised release is not available for conspiracy counts under 21 U.S.C. § 846. Government Br. at 62 n. 15.