07-5127-cr, 07-5532-cr
United States v. Simmons

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT
_____

August Term, 2008

(Argued: December 15, 2008                        Decided:  March 17, 2009)

Docket No. 07-5127-cr, 07-5532-cr
_____

UNITED STATES OF AMERICA,

Appellee-Cross-Appellant,

v.

HASAN SIMMONS, also known as KEVIN SIMMONS, also known as HASSAN SIMMONS,

Defendant-Appellant-Cross-Appellee.

_____

Before: POOLER, SOTOMAYOR and KATZMANN, Circuit Judges.

_____

Hasan Simmons appeals from a judgment of conviction, following a jury trial, for the

crime of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and a

sentence of 175-months' imprisonment, entered by the United States District Court for the

Southern District of New York (Hellerstein, J.).  We affirm the district court's denial of the

motion to suppress because the police officers, responding to a radio dispatch based on an

emergency 911 call that reported an assault in progress possibly involving a firearm, had

reasonable suspicion to stop and to search Simmons.  We also affirm the district court's decision

to excuse a juror pursuant to Federal Rule of Criminal Procedure 23(b)(3).  However, we remand

1

to the district court for resentencing.

The judgment of conviction is AFFIRMED. The case is REMANDED to the district court for resentencing.

_____

JOHN T. ZACH, Assistant United States Attorney, (KATHERINE POLK FAILLA, Assistant United States Attorney, on the brief) for LEV DASSIN, Acting United States Attorney for the Southern District of New York, New York, NY, for Appellee-Cross-Appellant,

SABRINA A. HOULTON, (JOSEPH W. MARTINI, on the brief), Wiggin and Dana LLP, New Haven, CT, for Defendant-Appellant-Cross-Appellee.

_____

POOLER, Circuit Judge:

Hasan Simmons appeals from a judgment of conviction, following a jury trial, for the crime of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and a sentence of 175-months' imprisonment, entered by the United States District Court for the Southern District of New York (Hellerstein, J.). Simmons appeals (1) the district court's denial of his motion to suppress evidence of his possession of two firearms; (2) the district court's decision to excuse a juror during the jury's deliberations, after which the remaining eleven jurors returned a verdict of guilty; and (3) the district court's sentence. We find that the police officers, responding to a radio dispatch based on an emergency 911 call that reported an assault in progress possibly involving a firearm, had reasonable suspicion to stop and to search Simmons. We therefore affirm the district court's denial of Simmons' motion to suppress the firearms. We also affirm the district court's decision to excuse a juror pursuant to Federal Rule of Criminal Procedure 23(b)(3). In light of our decision in United States v. Darden, 539 F.3d 116 (2d Cir.

2

2008), we remand to the district court for resentencing.

## BACKGROUND

### I.  Factual Background

The following facts are based on the evidentiary hearing held by the district court.  On November 12, 2005, at approximately 4:25 a.m., New York Police Department ("NYPD") Officer Hugh McHugh and NYPD Detective Robert DiPaola, while on patrol in a squad car, received a radio dispatch informing them that an assault, possibly with a weapon, was in progress at a nearby apartment building.  The dispatch was based on a 911 call from an anonymous caller.  The dispatcher stated: "Receiving a 34 with a weapon at 1410 Prospect. . . . There is a possible gun involved, of a male black, wearing a grey hoody, black jacket."  The officers understood a "34" as code referring to an assault in progress.

The officers arrived at 1410 Prospect Avenue approximately two minutes after receiving the dispatch.  Officer McHugh testified that "1410 Prospect Avenue is located in a neighborhood that has a problem with drugs, shots fired, and . . . a gang presence."  When the officers arrived, they saw a group of people outside the apartment building, and asked whether "anyone was being beaten up," to which the group answered "no."  McHugh "did not see anyone being assaulted" and "did not see evidence" that an assault had occurred.  McHugh then approached the front entrance of the building, and looked through the window.  McHugh saw three individuals inside the lobby, one of whom was Simmons.  Simmons, a black male, was wearing a gray, hooded sweatshirt and a black jacket.  There was no indication from the officers' initial observations that Simmons was "engaged in an assault in progress."

McHugh called to DiPaolo and the two officers entered the building.  As the officers

3

entered through the vestibule separating the lobby and the front entrance of the building, Simmons began walking toward them with his hands in his jacket pockets. McHugh ordered Simmons to "hold on a second" but Simmons continued walking. McHugh again ordered Simmons to "hold on a second," and Simmons stopped. McHugh then told Simmons to remove his hands from his pockets. Simmons did not remove his hands. McHugh asked a second time that Simmons remove his hands, and Simmons again did not comply. McHugh then "grabbed over to" Simmons' right side where he "felt the butt of a gun," and told DiPaola, "he's packing." The officers searched Simmons and recovered two loaded firearms, one from each of Simmons' jacket pockets. Simmons was arrested.

## II.     The District Court Proceedings

Simmons was charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Prior to the commencement of trial, Simmons filed a motion to suppress evidence of the firearms on the ground that the officers violated his Fourth Amendment rights. The district court denied the motion, finding that Simmons was "seized" for Fourth Amendment purposes at the time he complied with McHugh's second order to stop, and that the officers had reasonable suspicion that Simmons was engaged in criminal activity when he complied with the second order to stop. The court found reasonable suspicion "[o]n the basis of the anonymous tip reporting an assault in progress, the time of night, the number of people gathered in front of the building and in the lobby at 4:25 a.m., and [Simmons'] positioning of his hands inside his jacket pockets." The court also found that, "when [Simmons] refused to remove his hands from his pockets, the officer's action – grabbing [Simmons'] pockets – was reasonably related in scope to the circumstances that justified the interference in the first place."

4

Simmons' trial commenced on March 12, 2007. The jury began its deliberations at 12:55 p.m. on March 14, 2007. During its deliberations, on March 14 and 15, 2007, the jury twice requested that the court repeat the reasonable doubt instruction, and submitted a note to the court that said, "[w]e cannot come to a unanimous decision," to which the court instructed the jury to continue with its deliberations. The jury did not deliberate on Friday, March 16, 2007, and returned to deliberate on Monday, March 19, 2007. When the jury returned on March 19, Juror No. 6 was not present. The district court informed the parties "that Juror No. 6 . . . has reported unable to come today because her child is ill." On the record, the district court asked the clerk, "Anything more that you know?" The clerk responded, "No. I spoke to her and I told her that I would call her back to let her know what we're going to do."

The district court then had a colloquy with the parties as to whether the juror should be excused for "just cause" pursuant to Federal Rule of Criminal Procedure 23(b)(3). Simmons' counsel objected to excusing the juror due to the lack of information regarding the juror's anticipated length of absence, and because the course of deliberations suggested that there was a "split jury." The government favored dismissal due to the "shortness of the case" and the "narrow issues" presented to the jury. The district court ultimately excused Juror No. 6 "because of the quality of the trial and because of the indivisible nature of justice." The court also explained its interest in avoiding inconvenience to the other jurors, including one juror who previously indicated that protracted jury service would cause her financial hardship.

The district court informed the jury that Juror No. 6 was excused and instructed the jury to continue with deliberations. About a half-hour later, the district court was informed that the jury had reached a verdict. Given the brief period of time between the dismissal of the juror and

5

the jury reaching its verdict, Simmons' counsel requested that the court "hold the verdict and allow Juror No. 6 to return." The court denied the request, noting that when Juror No. 6 was excused, it was unknown whether "[Juror No. 6] had come to a view or had not come to a view, . . . how she was then voting, if the jury was taking votes or likely to vote. We knew nothing." The jury was called into the courtroom, and returned a verdict of "guilty."

On November 9, 2007, the district court held a sentencing hearing. The district court ruled that the Armed Career Criminal Act, 18 U.S.C. § 924(e), did not apply to Simmons, and it therefore should have applied the ten-year statutory maximum pursuant to 18 U.S.C. § 924(a)(2). However, the district court sentenced Simmons to 175-months' imprisonment. In a letter dated November 14, 2007 and received by the district court on November 20, 2007, Simmons requested that the district court reduce his sentence since 175-months' imprisonment exceeded the ten-year statutory maximum provided in 18 U.S.C. § 924(a)(2). On December 11, 2007, the district court issued an order that recognized Simmons was sentenced above the ten-year statutory maximum "in error," but found that the seven-day period for reducing a sentence had elasped. See Fed. R. Crim. P. 35(a). The district court, therefore, instructed the parties to "bring [its] order [recognizing the error] to the attention of the Court of Appeals." The parties now agree that we must remand to the district court for resentencing if the conviction is affirmed.[1]

_____

[1] The government originally filed a cross-appeal challenging the district court's decision to sentence Simmons below the fifteen-year mandatory minimum sentence prescribed by 18 U.S.C. § 924(e). The district court determined that one of Simmons' prior felony drug convictions did not qualify as a "serious drug offense," 18 U.S.C. § 924(e), because the prior offense no longer carried a statutory maximum of ten years, even though the prior offense had a statutory maximum of ten years when Simmons was originally sentenced in state court. The government has declined to pursue its challenge further in light of our recent decision in United States v. Darden, 539 F.3d 116, 121 (2d Cir. 2008), which held that a sentencing court should consider the current state law, not the law at the time of conviction, to determine whether the

6

## I.     Standard of Review

The existence of reasonable suspicion to support a stop is a mixed question of law and fact that is reviewed de novo.  United States v. Singh, 415 F.3d 288, 293 (2d Cir. 2005).  The district court's factual findings on a motion to suppress are reviewed for clear error.  Id.

## II.     The Terry Stop of Simmons

### A.     Anonymous Tips and Ongoing Emergencies

Simmons argues that the NYPD officers lacked reasonable suspicion to stop him based on an uncorroborated, anonymous 911 call.  In Terry v. Ohio, the Supreme Court held

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. 1, 30 (1968).  In reviewing the reasonableness of a Terry stop, we ask whether there was a "'particularized and objective basis'" for suspicion of legal wrongdoing under the "'totality of the circumstances.'"  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

Simmons' argument relies on the Supreme Court's decision in Florida v. J.L., 529 U.S. 266 (2000).  In J.L., the Supreme Court considered "whether an anonymous tip that a person is

---

defendant is subject to the fifteen-year mandatory minimum for a "serious drug offense" under the ACCA.

carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." Id. at 268. An anonymous caller had reported to police "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. There was "no audio recording of the tip, and nothing [was] known about the informant." Id. When police responding to the call encountered three black males at the bus stop, one of whom was wearing a plaid shirt, the officers stopped and frisked them, and discovered a gun on the black male in the plaid shirt. Id.

The Court explained that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" Id. at 270 (quoting Alabama v. White, 496 U.S. 325, 327 (1990)). The Court found, however, that the anonymous tip in J.L. lacked sufficient reliability. The problem with the officers' actions in J.L. was that they stopped and searched based solely on the "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." Id. at 271.

Simmons contends that the anonymous tip here was similarly lacking in reliability because the officers never confirmed that an assault had occurred, and the officers' observation that Simmons' race, clothing, and presence at the apartment building matched the information provided by the tip was insufficient to justify the Terry stop. In J.L., the Court specifically rejected the government's argument that a stop and frisk is permissible "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip." Id.

8

(quotation marks omitted).  The Court reasoned:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

Id. at 272; see also id. at 270-71 (distinguishing the reliable tip in White, 496 U.S. at 332, where police confirmed the tipster's accurate prediction of the "future movements" of the suspect).  Simmons concludes that J.L. compels suppression here because the officers' investigative stop was based on an uncorroborated, anonymous tip.

The anonymous 911 call in this case, however, reported an assault with a weapon in progress, unlike the tip in J.L. which reported the simple possession of a firearm.  The Court in J.L. noted that "[t]he facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability."  Id. at 273.  Several circuit courts drawing from this language have "distinguished J.L. when the tip is not one of general criminality, but of an ongoing emergency."  United States v. Hicks, 531 F.3d 555, 558-59 (7th Cir. 2008) (collecting cases); see also United States v. Brown, 496 F.3d 1070, 1071, 1077 (10th Cir. 2007) (911 call reporting a man who entered an apartment brandishing a gun and threatening the tenant); United States v. Elston, 479 F.3d 314, 315, 319 (4th Cir. 2007) (911 call reporting a drunk driver who had recently left the caller's home and threatened to use a firearm in his possession in the future); United States v. Terry-Crespo, 356 F.3d 1170, 1172, 1176 (9th Cir. 2004) (911 caller had been threatened by the suspect with a firearm); cf. United States v. Holloway, 290 F.3d 1331, 1338-39 (11th Cir. 2002) (warrantless search of a home was upheld based on a 911 call that reported

9

hearing gunshots at the residence). These cases have found that a tip reporting an ongoing emergency, as opposed to the general criminality at issue in J.L., is entitled to a higher degree of reliability.

We have not had occasion in a criminal case to address whether an anonymous tip that reports an ongoing emergency is entitled to greater reliability than one alleging general criminality. However, in Anthony v. City of New York, we considered a civil rights case that challenged, inter alia, the warrantless entry of police into a home based on an anonymous 911 caller's allegation that she was being attacked by a man with a knife and a gun. 339 F.3d 129, 131 (2d Cir. 2003). We affirmed summary judgment for police officers, although the officers discovered no evidence of an assault, on the ground that their warrantless entry into the home was justified by exigent circumstances. Id. at 136. Any concern with the reliability of an uncorroborated, anonymous tip was "not implicated . . . where the caller expressed an immediate risk of harm to herself, and where the address from which the call was placed was verified." Id.

We agree with our sister circuits that an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality. Cf. id.; see also United States v. Elmore, 482 F.3d 172, 181 (2d Cir. 2007) (recognizing that "it is useful to think of known reliability and corroboration as a sliding scale"). The higher degree of reliability is "rooted in the special reliability inherent in reports of ongoing emergencies." Hicks, 531 F.3d at 559. Given the greater reliability of an emergency 911 call, the requisite level of corroboration is lower. See id. at 559-60; see also White, 496 U.S. at 330 ("[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be

required if the tip were more reliable."). This approach recognizes the need for police to act on reports of an emergency situation without delay, see Terry-Crespo, 356 F.3d at 1176, but still requires police officers to corroborate allegations of criminal activity in some meaningful way. The basic requirement remains that an investigative stop must be predicated on reasonable suspicion that criminal activity is afoot. See Terry, 392 U.S. at 30.

### B.  The Seizure

A Terry stop must be "justified at its inception." Id. at 20.  A seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained. United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005).  The district court found that Simmons was "'seized' when he complied with Officer McHugh's second order to stop."  We agree for the reasons set forth below.

A police officer's order to stop constitutes a seizure if "a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554 (1980), and the person complies with the officer's order to stop, Swindle, 407 F.3d at 572.  As the officers entered the building, Officer McHugh twice ordered Simmons to stop and Simmons complied with the second order to stop.  The officers were then standing between Simmons and the doorway to the building, and McHugh testified that Simmons was "not free to leave."  The totality of the circumstances demonstrate that Simmons was seized the moment that he complied with the second order to stop.

The government contends, assuming that Simmons was seized when he complied with the second order to stop, that we may still consider Simmons' refusal to remove his hands from his pockets in reviewing whether the officers had reasonable suspicion for the initial stop.  The

11

government points to <u>Swindle</u> where we found that Supreme Court precedent "strongly implies . . . that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given." 407 F.3d at 568 (discussing the rule from <u>Hodari D.</u>, 499 U.S. at 629). In our view, the government's argument that Simmons' refusal to remove his hands is relevant to the reasonableness of the initial stop rests on a misapplication of the rule from <u>Hodari D.</u>, as we explained that rule in <u>Swindle</u>.

As we noted in <u>Swindle</u>, in <u>Hodari D.</u>, the Supreme Court assumed that police pursuit of the defendant was a show of authority, and although the officers lacked reasonable suspicion when they initially pursued the fleeing defendant, the Court determined that "'since Hodari did not comply with that injunction and was not seized until he was tackled, the cocaine abandoned while he was running was . . . not the fruit of a seizure.'" <u>Id.</u> (quoting <u>Hodari D.</u>, 499 U.S. at 629) (alterations omitted). Similarly, in <u>Swindle</u> itself, we found that police officers unreasonably ordered the defendant to stop based on his entry into a drug house, but that the defendant was not seized when police attempted to pull over his vehicle because the defendant did not stop the vehicle, proceeded to break several traffic laws, and threw a plastic bag containing cocaine from the vehicle. The cocaine was "not the fruit of a Fourth Amendment seizure" because the suspect discarded the drugs before he had been physically apprehended or submitted to police authority. <u>Id.</u> at 572-73; <u>see also</u> <u>United States v. Muhammad</u>, 463 F.3d 115, 122-23 (2d Cir. 2006) (the suspect who attempted to flee police on a bicycle was not seized until physically restrained by police, and thus the attempt to flee was relevant to the determination of reasonable suspicion for the seizure).

12

Hodari D., Swindle, and Muhammad are distinguishable from this case. The rule from

Hodari D. – "the grounds for a stop may . . . be based on events that occur after the order to stop

is given," Swindle, 407 F.3d at 568 – has been applied only in cases where the suspect attempts

to flee from police after being ordered to stop. Hodari D., Swindle, and Muhammad all involved

a police show of authority, a defendant who refused to comply by fleeing, police pursuit, and a

"seizure" occurring at the moment the defendant was physically restrained. Hodari D. 499 U.S.

at 625-26; Muhammad, 463 F.3d at 122-23; Swindle, 407 F.3d at 572-73. The facts of this case,

by contrast, involve an order to stop, compliance with that order, and a "seizure" at the moment

Simmons complied with the order.[2] The arguably suspicious refusal to remove his hands came

after he obeyed the order to stop.

The grounds for a stop must exist at the time of the seizure. See Swindle, 407 F.3d at

567-68, 572. The rule from Hodari D. is based on the "settled requirement . . . that reasonable

suspicion must arise before a search or seizure is actually effected." Id. at 568 (emphasis added).

Flight in response to an order to stop is relevant to the reasonableness of a stop because it

precedes the seizure, which occurs when the fleeing suspect is physically apprehended. See

Hodari D. 499 U.S. at 625-26; Muhammad, 463 F.3d at 122-23; Swindle, 407 F.3d at 572-73; see

also United States v. Baldwin, 496 F.3d 215, 218 (2d Cir. 2007) (holding that a suspect is not

---

[2] Simmons was inside the lobby of the apartment building and was walking toward the doorway of the building as the officers entered through it. The government asserts that Simmons was attempting to "leave the scene." Contrary to this characterization, the district court made no finding that Simmons' behavior was indicative of flight. The district court found that Simmons was walking toward the officers when they entered the building, that he continued walking when he was first ordered to stop, and halted when given the second order to stop. The district court's factual finding that Simmons was walking toward the officers as they entered the building, but did not flee from the officers, was not clearly erroneous. Singh, 415 F.3d at 293 (stating that the district court's factual findings on a suppression motion are reviewed for clear error).

13

seized when he "halt[s] temporarily" in response to an order to stop and then flees). Conversely, a person's compliance with an officer's order to stop where a reasonable person would not feel free to leave is a seizure, and sets the point in time for evaluating the presence of reasonable suspicion for the stop. See Swindle, 407 F.3d at 572-73.

Simmons was seized when he obeyed the officer's second order to stop. See Baldwin, 496 F.3d at 219 ("A reasonable person standing in [the defendant's] place would have felt bound to stop, and having stopped and stayed, would be able to argue suppression on the ground of a baseless seizure."). The events that occurred after Simmons complied, therefore, do not factor into the analysis of reasonable suspicion for the initial stop. See United States v. Brown, 448 F.3d 239, 245-46 (3d Cir. 2006) (finding the defendant submitted to police authority when he complied with an officer's order to stop and was informed that a robbery victim was coming to identify him as a possible suspect, even though he later struggled when the officer attempted to perform a patdown search). We inquire whether there was reasonable suspicion at the time of Simmons' seizure — to wit, when he complied with the officer's second order to stop.

## C.     Reasonable Suspicion

Here, while the case is close, we find that the officers had reasonable suspicion for the stop of Simmons. Responding to a dispatch that communicated the 911 caller's report of an assault in progress, possibly involving a weapon,[3] the officers, despite not finding evidence of an

---

[3] There appears to have been some information in the 911 call that was not communicated to the officers, including that the suspect had pointed a gun at the 911 caller. The parties agree, based on our decision in United States v. Colon, 250 F.3d 130, 138 (2d Cir. 2001), that the investigative stop cannot be justified based on information that the 911 caller provided to the operator, but that was not communicated either to the dispatcher or to the investigating officers prior to the stop. Because we confine our analysis to the information known to the officers at the time of the stop, this case does not implicate issues related to the "collective knowledge"

14

assault in progress, confirmed that Simmons' appearance matched the description of the suspect and that Simmons was present at the specified location. The officers' corroboration of information identifying the suspect, while insufficient in J.L., 529 U.S. at 271-72, is entitled to more weighty consideration in the context of an emergency 911 call. This follows from our holding that a 911 call reporting an ongoing emergency is accorded a higher degree of reliability and requires a lesser showing of corroboration. We need not determine whether the corroboration of information from an emergency 911 call that identifies the suspect is, without more, sufficient to provide reasonable suspicion because, in this case, there were additional factors that supported the stop.

It is a relevant consideration, though by no means dispositive, that the officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Officer McHugh did not observe any threatening behavior by Simmons. Yet, as the officers entered the building, Simmons was walking toward them with his hands in his pockets. See United States v. Padilla, 548 F.3d 179, 187 (2d Cir. 2008) (noting that conduct as consistent with innocence as with guilt may support a finding of reasonable suspicion where there exists an indication of possible illicit activity); see also Terry, 392 U.S. at 22 (explaining that acts which are not inherently suspicious can "taken together warrant[] further investigation"). This conduct could have suggested to the officers that Simmons was concealing a weapon, especially since the dispatcher reported that the suspect may have perpetrated an assault with a weapon based on information in the 911 call. Although "[a]n individual approached by an officer who has no

doctrine. Cf. id.

15

reasonable suspicion of wrongdoing may ignore the officer and go about his business" without triggering reasonable suspicion, Muhammad, 463 F.3d at 123, Simmons' non-compliance with the first order to stop, when viewed in light of the circumstances, reinforced the officers' determination that he may have been engaged in criminal activity. Cf. Swindle, 407 F.3d at 572 (the grounds for a stop may be based on events before the seizure). In the context of the emergency 911 call here, the totality of circumstances support the conclusion that the officers had reasonable suspicion to stop Simmons.

The next question is whether the officers had reasonable suspicion to frisk Simmons. See Arizona v. Johnson, --- U.S. ---, 129 S. Ct. 781, 784 (2009) (describing the "two conditions" for a constitutional Terry "stop and frisk": (1) the officer has reasonable suspicion "that the person apprehended is committing or has committed a criminal offense"; and (2) "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous"); see also Adams v. Williams, 407 U.S. 143, 146 (1972) (stating that a patdown is justified when an officer reasonably believes that a suspect is armed and dangerous because it "allow[s] the officer to pursue his investigation without fear of violence"). The officers, after initiating the stop, twice ordered that Simmons remove his hands from his pockets, which he refused to do. The report of an assault in progress, the matching description, and the additional factors that supported the stop provided the officers with reason to believe that Simmons was armed and dangerous, and that the refusal to remove his hands was an effort to conceal a weapon. Accordingly, the officer conducting the patdown search was "warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27.

Simmons' refusal to remove his hands is unlike the mere "refusal to cooperate, [that]

16

without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991). As explained, the factors supporting the stop were established before Simmons refused to remove his hands, and this refusal – because it occurred after Simmons was seized – was not a factor supporting the initial stop. However, Simmons' refusal to remove his hands after the officers justifiably initiated the stop provided an additional reason to conduct the patdown search. We therefore affirm the district court's denial of the motion to suppress the firearms.

### III.    The Dismissal of a Juror During Deliberations

Federal Rule of Criminal Procedure 23(b)(3) provides that, "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict . . . if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b)(3). In this case, after the jury commenced its deliberations, the district court excused an absent juror who was unavailable because her child was ill. Simmons was then found guilty by the remaining eleven jurors. We review the decision to excuse a juror pursuant to Rule 23(b)(3) for an abuse of discretion. United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1994).

The crux of Simmons' challenge is that there was insufficient information to support the district court's decision to excuse the juror. See id. ("All that is needed to satisfy a prudent exercise of discretion [under Rule 23(b)(3)] is to be certain the trial court had sufficient information to make an informed decision."). Simmons argues that a district court must have "some information regarding the amount of time the juror is likely to be absent in order to dismiss the juror under Rule 23(b)." While Simmons concedes that this Court has not specifically adopted such a rule, he contends that we also have not affirmed a juror dismissal

17

under Rule 23(b)(3) in the absence of information regarding the juror's anticipated length of unavailability.  See United States v. Paulino, 445 F.3d 211, 225-26 (2d Cir. 2006) (the court, after "repeated inquiries of the ill juror," determined that the illness would prevent the juror from deliberating for two days); United States v. Gibson, 135 F.3d 257, 259 (2d Cir. 1998) (per curiam) (the district court, told by the juror's daughter that the juror had collapsed on the subway and was hospitalized, found that the juror would be unavailable for some time); United States v. Stratton, 779 F.2d 820, 832 (2d Cir. 1985) (the district court found that the juror would be unavailable for four and one-half days to observe a religious holiday).

We have recognized that Rule 23 accords "wide latitude" to district courts making trial management decisions, see, e.g., Paulino, 445 F.3d at 226 (quotation marks omitted), and for juror dismissal, requires that a court have "'sufficient information to make an informed decision.'"  Id. (quoting Reese, 33 F.3d at 173).  In this case, Juror No. 6 reported that she was "unable to come [that day] because her child [was] ill."  The district court, with knowledge of this report, had sufficient information that the child's illness would prevent Juror No. 6 from participating in deliberations for at least one day.  See id. ("[T]he law establishes no bright-line test for determining the length of juror unavailability that constitutes good cause for excusal.").  Although the district court expressly noted that "[p]ossibly [Juror No. 6] could come tomorrow," it made no additional inquiry of the juror's anticipated length of unavailability.  Contra Paulino, 445 F.3d at 226; Stratton, 779 F.2d at 831.  The question is whether it was error for the district court – knowing the juror would be absent at least one day but without knowledge as to the likelihood of her absence extending beyond that day – to fail to inquire of the juror's anticipated length of unavailability.

18

Making an inquiry into a juror's anticipated length of unavailability, while certainly a better practice than foregoing such inquiry, is not necessarily required. See Reese, 33 F.3d at 173 ("Whether and to what extent a juror should be questioned regarding the circumstances of a need to be excused is . . . within the trial judge's sound discretion."). The district court here was not required to conduct a further inquiry after determining that a one-day absence supported dismissal. But this is only because the court also found that waiting an additional day before continuing deliberations risked the absence of another juror, who had alerted the court that extended jury service would cause financial hardship, and who would miss additional work days if deliberations were delayed. Without basing its decision on this additional factor, we have serious doubts as to whether the district court's decision would have been a permissible exercise of discretion, as the decision lies at the margins of that discretion.

The absence of information regarding the anticipated length of a juror's unavailability, while it does not preclude excusing the juror, warrants closer scrutiny of the information the district court relied upon in arriving at its decision. The district court referred to "the quality of the trial" and "the indivisible nature of justice" as two of its reasons for dismissing the juror. We do not see how these abstractions offer support for excusing a juror. However, the district court also stressed the significant risk that another juror might seek to be excused if deliberations were delayed, appearing to be concerned with the possibility of a mistrial. See Gibson, 135 F.3d at 260 ("We have held that proceeding with eleven jurors is generally preferable to a mistrial." (citing Stratton, 779 F.2d at 831-32)). While this case is close, because the district court determined both that the juror would be absent at least one day and that delaying deliberations might result in another juror's hardship, we find that the district court's decision to excuse the

19

juror was based on sufficient information.[4]

Simmons also argues that the district court should have investigated the juror's asserted unavailability because "the jury was split and could not reach a unanimous decision." The deliberations prior to Juror No. 6's absence – which included two requests to hear the reasonable doubt instruction and a note to the court stating, "[w]e cannot come to a unanimous decision" – indicate that the jury was not initially able to reach a verdict. The course of deliberations prior to a juror's absence is relevant to the determination of whether to excuse a juror, and a district court might consider evidence of a divided jury to counsel restraint before excusing a juror. But, contrary to Simmons' suggestion, the record does not provide "the slightest basis to believe that [Juror No. 6] was excused on a pretext to remove an obstacle to reaching a unanimous verdict." Stratton, 779 F.2d at 832. The district court, therefore, was permitted to excuse the juror even though the prior course of deliberations suggested a jury divided over whether to convict.

As the district court noted, it had no knowledge of Juror No. 6's views on the merits of the case when she was excused. Cf. United States v. Thomas, 116 F.3d 606, 620-22 (2d Cir.

---

[4] Simmons points to several out-of-circuit cases that found inadequate consideration of the length of a juror's unavailability was an abuse of discretion. See United States v. Araujo, 62 F.3d 930, 935-36 (7th Cir. 1995) (holding that there is a "duty under Rule 23(b) to ascertain the likely duration of a missing juror's absence before dismissing him or her," and that the district court had not determined how long car trouble would delay the juror); United States v. Patterson, 26 F.3d 1127, 1129 (D.C. Cir. 1994) (finding an abuse of discretion where the district judge, although aware the juror was having chest pains and needed to go to the doctor, "made no attempt to learn the precise circumstances or likely duration of the twelfth juror's absence"); United States v. Tabacca, 924 F.2d 906, 915 (9th Cir. 1991) (finding the district court erred in dismissal of a juror who was "certain to be available the next day" as "[t]he only reason [the juror] was out was because his wife had his car keys"). These cases do not control here. Because the district court had sufficient information to excuse the juror under the circumstances of this case, it was not required to conduct a further inquiry into the length of the juror's absence.

1997) (discussing the need for limits on inquiries that intrude upon the secrecy of the jury's deliberative process, and holding that dismissal cannot be based on "the juror's view of the sufficiency of the government's evidence" (quotation marks omitted)); United States v. Hernandez, 862 F.2d 17, 23 (2d Cir. 1988) ("That a juror may not be removed because he or she disagrees with the other jurors as to the merits of a case requires no citation."). The fact that the jury returned a guilty verdict about thirty minutes later does not support a finding that the district court abused its discretion in excusing the juror beforehand. Admittedly, the facts are at least consistent with Simmons' theory that excusing Juror No. 6 may have inadvertently cleared the way for a guilty verdict, as they are consistent with a jury returning from a weekend break, having already deliberated for two days, and reaching consensus. There is nothing in the record, however, to indicate that Juror No. 6 was excused to secure a verdict, see Stratton, 779 F.2d at 832, or because she disagreed with the other jurors, see Hernandez, 862 F.2d at 23. We therefore do not disturb the district court's decision.

## IV.     Sentencing

The district court determined that the ACCA did not apply to Simmons for sentencing purposes, and that the ten-year statutory maximum under 18 U.S.C. § 924(a)(2) was applicable. This decision was correct in light of our recent precedent. Darden, 539 F.3d at 121 (holding that a sentencing court should consider the current state law, not the law at the time of conviction, to determine whether the defendant is subject to the ACCA's fifteen-year mandatory minimum for a "serious drug offense"). As later recognized by the district court after the seven-day period for reducing a sentence had elasped, see Fed. R. Crim. P. 35(a), and as the parties now agree, the district court's sentence of 175-months' imprisonment was improperly in excess of the ten-year

statutory maximum.  The sentence, therefore, was in error, and we remand to the district court for resentencing.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is AFFIRMED.  We REMAND to the district court for resentencing.